CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

03/26/2025

LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
(Danville Division)**

|  |  |
|---|---|
| AVERETT UNIVERSITY OF DANVILLE, VIRGINIA, ) | |
| ) | |
| ) | |
| ) | CIVIL ACTION NO. ___4:25cv00019___ |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| GLOBAL STRATEGIC INVESTMENT ) | (JURY TRIAL DEMANDED) |
| SOLUTIONS, LLC, ) | |
| CURT THOMPSON, ) | |
| DON CALLAGHAN ) | |
| NICK BOTTICELLI ) | |
| MATT UNDERWOOD, ) | |
| DAN CHESIN, and ) | |
| DONALD BRUCE AUNGST. ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Averett University of Danville, Virginia ("Averett" or "the University"), by counsel, brings this Complaint against Defendant Global Strategic Investment Solutions (GSIS) and states as follows:

### NATURE OF THE CASE

1.      Averett University brings this action because its Chief Financial Officer ("CFO") and Outsourced Chief Investment Officer ("OCIO"), who were supposed to preserve the University's endowment and general financial health, instead betrayed the University's trust. Rather than exercising appropriate oversight of Averett's operations and investments, the CFO and OCIO used Averett's endowment to cover budget deficits without authority or consent from the

1

University's Board of Trustees. Worse still, they took steps to conceal the illicit draws from the endowment from Averett's Board of Trustees and executive staff. While facilitating the withdrawal of millions of dollars from Averett's endowment to cover the CFO's ineptitude, the OCIO gave regular reports to the Averett Board of Trustees in which the OCIO misrepresented the true state of the endowment.

2.      Averett University hired Donald Aungst ("Aungst") to serve as its CFO in March 2020. Shortly thereafter, Global Strategic Investment Solutions ("GSIS") colluded with Aungst to obtain private, confidential financial information to help it win a contract with the University to serve as the University's OCIO and co-fiduciary.

3.      In GSIS's contract with Averett University, it promised to act as Averett's fiduciary, to manage Averett's endowment within set parameters, and to provide the Board of Trustees with accurate reports regarding the financial health of transactions affecting the endowment.

4.      Beginning around April 2022, until about April 2024, while serving as a fiduciary and investment advisor to Averett, GSIS and its employees, in collaboration with Aungst, surreptitiously drained Averett's endowment of almost $20 million.

5.      GSIS facilitated the withdrawal of assets from Averett's endowment at the request of Aungst. GSIS repeatedly misrepresented to the Board of Trustees the state of the endowment funds, concealed from them the type and nature of the withdrawals that it was making, and repeatedly sold off endowment funds without appropriate approvals, in direct contravention of its agreement with Averett.

6.      In short, GSIS and Aungst facilitated the erosion of Averett's endowment and actively hid it from the Board. By the time that the true state of the endowment was uncovered in or about March 2024, Averett's endowment had been reduced by roughly 75% of its value.

## PARTIES

7.     Averett University ("Averett" or "the University") is a private, not for profit, university located in Danville, Virginia, in the Western District of Virginia. Averett was founded in 1859. Averett is a fully accredited four-year college. It is home to more than 1,300 students from 24 states and 20 countries.

8.     Averett is managed by a Board of Trustees ("Board"). The Board has authority over the University endowment funds (collectively, the "Endowment"), which include various gifts, investments and accounts intended to be preserved in perpetuity and only spent in accord with Virginia law and the University's Investment Policy Statement. A subset of Board members serve on the Sustainable Foundations Committee that oversees various financial functions. The Endowment Subcommittee of the Sustainable Foundation Committee oversees the management of the Endowment.

9.     Donald Aungst served as Chief Financial Officer of Averett University from March 2020 until he resigned on March 29, 2024. Upon information and belief, Aungst currently resides in Marco Island, Florida.

10.     Global Strategic Investment Solutions, LLC is an SEC-registered Investment Advisor. It is a limited liability company formed under Arizona law, and its principal place of business is Scottsdale, Arizona. GSIS served as Averett University's Outside Chief Investment Officer ("OCIO") from in or about December 2020 until in or about April 2024.

11.    According to public records available through the Arizona Corporation Commission, the members of GSIS are Curt Thompson and Donald Callaghan, both of whom are residents of Arizona.  Thus, GSIS is domiciled in Arizona.

12.    Curt Thompson co-founded GSIS, where he remains a member and managing partner.  He is a resident of Arizona.

13.    Don Callaghan co-founded GSIS, where he remains a member and managing partner.  He is a resident of Arizona.

14.    Nick Botticelli was GSIS's Chief Investment Strategist, and he is a resident of Florida.

15.    Matt Underwood was GSIS's Director of Research & Portfolio Management, and he is a resident of North Carolina.

16.    Dan Chesin was GSIS's Director of Operations, and he is a resident of Arizona.

17.    Defendants Callaghan, Boticelli, Underwood, and Chesin are referred to herein as the "Individual Defendants." At all times relevant to this Complaint, the Individual Defendants were acting within the course and scope of their employment for GSIS.

## JURISDICTION AND VENUE

18.    The Court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. §1332. The amount in controversy herein exceeds $75,000.

19.    The claims asserted in Count VII arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.    The Court has jurisdiction over the subject matter of Count 6 in this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue properly lies in this Court under 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to the claims occurred in this District, where Plaintiff is located and where Defendants contracted with and breached their contract with Plaintiff to perform financial services, and engaged in a conspiracy with Don Aungst to injure Plaintiff in its trade, business, and profession, in violation of Va. Code Ann. §18.2-499 *et seq.*

22.     Venue also properly lies in this Court pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this District.

23.     In connection with the acts alleged in Count VII of this Complaint, GSIS and the Individual Defendants, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

**THE FACTS**

***GSIS Colluded with Averett's CFO to Obtain Its Contract with Averett***

24.     In March 2020, Averett University hired Aungst to serve as its Chief Financial Officer. At the time Aungst was hired, Averett already had an investment advisory firm that managed its Endowment.

25.     Shortly after Aungst was hired, he began to push Averett's Board to hire GSIS to replace the University's investment advisor.

26.     Curt Thompson, GSIS's managing partner, had a longstanding relationship with Aungst, and leveraged that relationship to obtain a contract with Averett.

27.     On or about September 3, 2020, Thompson sent Aungst a brochure for GSIS' "College & University Endowment Investment Management" services. Thompson stated that

GSIS is "committed to building the finest investment programs to help our clients achieve their long-term investment goals with *unwavering objectivity*." (emphasis added.) Aungst forwarded this email to the Chair of Averett's Endowment Committee along with a recommendation that Averett consider a move to an "outsourced, full fiduciary CIO." *See, Exhibit 1.*

28.     GSIS's brochure described GSIS and its employees, the Individual Defendants, as "co-fiduciaries" who manage endowment portfolios "within approved guideline [sic] and objectives." The brochure concluded with a promise from GSIS – in bold font – that "**We are accountable for the results**". *Id.*

29.     The head of the Board subcommittee responsible for managing the Endowment told Aungst that up until that point, the Endowment had been "reasonably steady" and "satisfactory." Upon reviewing GSIS's brochure, he indicated that using GSIS would be "different for us than the way we have operated for years." (*Id.*) However, he trusted Aungst to prepare a request for proposals ("RFP") to solicit new candidates to manage Averett's Endowment. *Id.*

30.     Rather than issue an RFP to multiple prospective advisors, however, Aungst effectively turned the matter over to GSIS. On October 1, 2020, Curt Thompson, GSIS managing partner, provided Aungst a draft RFP on Averett's letterhead for Aungst to use.

31.     On November 5, 2020, Aungst provided GSIS, through Thompson, with confidential financial reports from Averett's acting investment advisor. He provided these materials to facilitate GSIS' preparation of a PowerPoint presentation for Aungst to use in an upcoming meeting with Averett's Board.

32.     Aungst told GSIS to "keep this confidential that I shared this suggested meeting material with you." None of the members of Averett's Board were aware that Aungst was providing

confidential financial information to GSIS—and GSIS alone—to help it "win" the role as Averett's new investment advisor. *See, Exhibit 2.*

33.     GSIS took full advantage of the opportunity and special access that Aungst provided. On November 11, 2020, GSIS sent Aungst a slide deck that was effectively a sales pitch for GSIS. *See, Exhibit 3.* As the below screenshot illustrates, GSIS suggested that the Board skip the "extremely time-consuming" RFP process and simply engage GSIS as its OCIO. *Id.*

## Endowment Investment Management
### Three Options



| Temporarily Retain Oppenheimer | Engage Global Strategic an OCIO | Issue RFP |
|---|---|---|
| ❖ Committee not impressed with Oppenheimer | ❖ **Fiduciary Oversight of endowment portfolio on a full-time proactive basis** | ❖ **Time-Consuming:** The RFP process is an extremely time-consuming project for the CFO and Committee |
| ❖ Robinson Team at Oppenheimer is not a Discretionary / Fiduciary Relationship | ❖ **Deep and experienced team of investment professionals with a demonstrated track record of managing institutional endowment portfolios like Averett** | ❖ **Complexity:** Challenge to identify who to participate (over 80 firms claim to offer OCIO solution) |
| ❖ No Advanced Communication regarding new strategic ideas or managers | ❖ **Conflict Free Structure: GSIS is 100% objective. Does not sell any internal products or services that is now common at other OCIOs** | ❖ **Conflicts:** Many OCIO firms are units of large financial services companies and have significant imbedded conflicts |
| ❖ Delays in implementing time sensitive strategies had led to significant missed opportunities | ❖ **Cost Efficient: GSIS total program will save Averett more than $100K annually** | ❖ **Importance:** Averett would be a small client for most OCIO firms and would likely be courted by senior people but serviced by a less experienced team |
| ❖ Robinson team not an institutional focused advisor – sales/service group not a dedicated investment firm | | |



34.     GSIS, through its slide deck, made various promises to Averett regarding GSIS' role and aptitude as a fiduciary advisor to Averett. For example, GSIS and the Individual Defendants boasted that "we are co-fiduciaries and manage portfolios on a full-time proactive basis within approved guidelines and objectives to improve client outcomes." *Id.* The slide deck further avowed that "[w]e oversee all University investment assets (endowment, trusts where University is beneficiary, gift annuities, cash account)." *Id.* GSIS also promoted its "enhanced reporting program and communications" and accepted the responsibility to "prepare and present appropriate reports." *Id.*

35.     With Aungst's assistance, including by receiving confidential financial information without the Board's knowledge, GSIS was able to avoid having to compete with other firms to be retained as Averett's investment advisor.

36.     Shortly after Aungst's meeting with the Board, Averett indicated that it would retain GSIS as its OCIO at the beginning of 2021.

### GSIS Engages with Averett to Serve as its Fiduciary and Grow Its Endowment

37.     GSIS presented an Investment Advisory Contract ("Contract") to Averett to formalize the relationship, and the Contract was executed by the Parties on or about January 1, 2021. *See, Exhibit 4.*

38.     Among other things, the Contract affirmed the duties of GSIS and the Individual Defendants as Chief Investment Officer. These included supervising Averett's endowment assets pursuant to investment objectives and restrictions described in Averett's Investment Policy Statement ("IPS"), and to make regular reports to Averett. *Id.* at Sections I, II.

39.     GSIS also revised Averett's Investment Policy Statement, which was adopted by the Board and incorporated into the Parties' contract. *See, Exhibit 5.*

40.     The IPS explicitly limited annual spending from the Endowment to 4.875% of a trailing three-year average of the Endowment's total asset value. *Id.*

41.     The IPS—which was revised by GSIS for adoption by the University—explicitly proclaimed "the [Board's] desire to control risk to the extent possible to avoid dramatic declines in portfolio values as sequencing of returns is very important due to the Endowment's critical importance to the University in light of the annual draw." *Id.*

42.     Echoing the provisions of the Contract, the IPS gave GSIS, as the Outside Chief Investment Officer and "fiduciary advisor to the Fund", the responsibility to "[o]versee

8

Endowment and other University investments," and to "[p]repare and present appropriate reports for the CFO/COO, [Investment] Committee, and Board members." *Id.*

43.     The IPS bestowed on the Board the responsibility for the "selection and retention of an Outsourced Chief Investment Officer ('OCIO') as co-fiduciary and to help the Board achieve its 'prudent man' fiduciary responsibility." *Id.*

44.     The IPS further provided that "[t]he OCIO is expected to manage the Portfolio in a manner consistent with this [IPS] and in accordance with State and Federal law and the Uniform Prudent Investor Act. The OCIO shall be a Registered Investment Advisor and act as the investment advisor and co-fiduciary to the University." *Id.*

45.     The IPS established authorized spending parameters and investment policies. Authority to waive or deviate from those parameters rested solely with the Board and could not be delegated to Aungst or GSIS. The IPS provided that GSIS "may not change investment policy, including the targeted asset allocation, without the Committee approval." *Id.*

46.     The IPS recognized that the Board had a "fiduciary obligation to [its] donors, who intend that their gifts will support the University indefinitely." *Id*.

47.     The IPS provided for the Board to delegate that fiduciary responsibility to the Investment Committee, who in turn "has delegated responsibility for some routine portfolio management activities" to Aungst, as Chief Financial Officer and Chief Operating Officer. *Id.* Aungst therefore was entrusted with the same fiduciary obligations to the University as the Board.

48.     Aungst, as CFO, had the duty to, among other things, supervise GSIS, review all financial information provided by GSIS, prepare and submit accurate and timely financial reports to the Board, and manage the endowment's assets consistent with the terms of the IPS.

49.     The IPS contained a Distribution Policy to which Aungst and GSIS were obligated to adhere. This included the cap on the spending rate described above, an annual review by the Committee of the asset allocation, the ability of Aungst to suspend withdrawals during periods of market decline, and to create a liquidity reserve pool. *Id.*

50.     Per the IPS, which was incorporated into the Investment Advisory Contract between GSIS and Averett, GSIS promised to act as Averett's fiduciary, to manage Averett's endowment within the parameters of the IPS, and to provide accurate reports regarding transactions affecting the endowment.

51.     The Individual Defendants, as employees of GSIS and registered financial advisors, undertook fiduciary duties to Averett to adhere to the terms of the Contract and IPS, and to otherwise perform their financial services on behalf of Averett with an appropriate level of care and loyalty.

### *GSIS Facilitated the Opening of a Margin Loan*

52.     By April 2022, under Aungst's financial leadership, Averett had maxed out its line of credit, and it began to look for additional credit facilities. Aungst asked for GSIS' assistance in that effort.

53.     GSIS recommended to Aungst that Averett open a margin loan account with Charles Schwab, the custodian for Averett's investment portfolio.

54.     GSIS, through Dan Chesin and Curt Thompson, completed an application for the margin loan on Averett's behalf and forwarded it to Aungst and then-Averett President Tiffany Franks for signature via an email dated April 29, 2022.

55.     GSIS never advised the Board of the potential and significant risks associated with margin lending.

56.     Aungst, with GSIS's knowledge and consent, told the Board that the collateral for the margin loan would be limited to Averett's "quasi-endowment" or board-restricted funds.

57.     GSIS initially represented that only 25% of the Endowment would be pledged as collateral for the margin loan, and the remainder of the Endowment would be preserved and protected from any borrowing on margin.

58.     In communications with Aungst and Averett Board members, the Individual Defendants repeatedly and incorrectly referred to the margin loan as a "line of credit". GSIS and its employees were copied on similar correspondence from Aungst to the Board, in which Aungst incorrectly characterized the margin loan as a "line of credit."

59.     This mischaracterization was important because Averett was not supposed to be eligible for the margin loan.

60.     The application from Schwab specifically indicated that "[t]he following are not eligible for margin: retirement accounts, such as IRA's and 401(k)s, *and accounts for charitable and non-profit organizations.*" (emphasis added).

61.     GSIS never advised the Board that, according to Schwab, the margin loan product was not intended or appropriate for non-profit institutions. When asked about the propriety of the margin loan for a non-profit institution like Averett, GSIS downplayed the concern and suggested that a number of its other higher education clients used margin loans.

62.     Aware of the prohibition against non-profit organizations like Averett University obtaining a margin loan, GSIS and the Individual Defendants provided a corporate "Resolutions" form that required Averett to acknowledge that margin lending could jeopardize Averett's tax-exempt status. *See, Exhibit 6.*

63.     When presenting the loan to the Board, Aungst and GSIS also misrepresented when it would be used. In a May 5, 2022 email introducing the margin loan to the Board, Aungst assured the Board that "I would not tap the line of credit without first presenting a cashflow projection and specifically asking the Sustainable Foundation Committee of the Board for authorization to use the LOC." *See, Exhibit 7.*  Various Individual Defendants were copied on that email.

64.     On June 13, 2022, after the Board was duped into approving the margin loan, then-President Tiffany Franks and Aungst signed the application that GSIS had previously filled out.

65.     In or about June 2022, GSIS opened the margin loan account with Schwab.  GSIS did not inform the Board that the account was open at that time.

66.     In various emails during the summer of 2022, GSIS, through its employees and Individual Defendants, Curt Thompson and Dan Chesin, repeatedly told Averett that the corporate "Resolutions" form was a mandatory requirement of Schwab's that had to be completed in order to open the margin account. This was false.

67.     Not only was the margin loan account already open when GSIS and the Individual Defendants made these representations, but the corporate "Resolutions" form presented by GSIS to Averett was not created or required by Schwab. Upon information and belief, the Individual Defendants, acting within the scope of their employment for GSIS, doctored the form to make it look like it belonged to Schwab.

68.     In or about November 21, 2022, Dan Chesin again informed Aungst via email that Averett had to complete the (fabricated) corporate "Resolutions" form. GSIS, through Chesin, claimed that Schwab required execution of the form to complete the margin loan application. GSIS did not tell Aungst or the Board that the margin account had already been open for months.

69.    The corporate "Resolutions" form is not found on Schwab's online database, and representatives from Schwab have denied that the corporate "Resolutions" form was created or published by Schwab.

*GSIS Facilitated Unauthorized Borrowing Against the Endowment*

70.    On December 2, 2022, Aungst returned the completed corporate "Resolutions" form to GSIS and asked about "the timing for us to get access to funds." An hour after GSIS confirmed that the margin account was available for use, and without obtaining Board approval, Aungst asked GSIS to "[p]lease wire $1.4M."

71.    GSIS did not ask Aungst or the Board for confirmation that the use of the margin loan had been authorized by the Sustainable Foundations Committee, as promised in Aungst's May 5, 2022 email to the Board.  Instead, GSIS arranged for the money to be wired in compliance with Aungst's request.

72.    The initial request for $1.4 million was just the tip of the iceberg.

73.    In December 2022 alone, GSIS facilitated Aungst's requests to borrow $5.8 million from the margin account. This borrowing far exceeded the value of Averett's "quasi-endowment," and it was well beyond the 25% threshold that GSIS had initially represented would be the cap on Averett's margin loan.

74.    The Board did not approve, nor was it aware of, Aungst's requests that GSIS facilitate $5.8 million of borrowing from the margin loan.

75.    At no point did GSIS or any of the Individual Defendants ask for confirmation that the Board had authorized Aungst's requests for such exorbitant use of the margin loan, nor did anyone from GSIS reach out directly to anyone on the Board to ensure that the Board was even

aware of Aungst's aggressive use of the margin loan to cover University expenses and cash shortfalls.

76.     Instead of sounding an alarm with the Board, GSIS and the Individual Defendants dug an even bigger hole for Averett when they advocated for Schwab to extend Averett's borrowing power and increase the percentage limit on Averett's margin loan. On March 28, 2023, when the margin loan was already close to being maxed out, GSIS obtained from Schwab a special exception to raise Averett's borrowing limit. No one from GSIS consulted the Board about this exception, nor did GSIS confirm that the Board had authorized Aungst to continue drawing from the margin loan to the point that it was maxed out. *See, Exhibit 8.*

77.     In addition to increasing the borrowing capacity on the margin loan, GSIS and the Individual Defendants actively took steps to rebalance the Endowment portfolio to create additional margin loan capacity. For example, GSIS reallocated Averett's endowment portfolio to increase the securities that could serve as collateral for margin lending. This involved moving funds out of higher-performing private investments into more liquid (but less profitable) securities and instruments.

78.     Thus, to enable Aungst's unauthorized borrowing and/or spending from the Endowment, GSIS took steps that reduced the Endowment's potential returns.

### *GSIS Allowed Aungst to Drain Averett's Endowment*

79.     The erosion of Averett's Endowment did not stop when the margin loan was maxed out. Instead, GSIS enabled Aungst to make unauthorized withdrawals directly from the Endowment to cover Averett's operating deficit, without disclosing those expenditures to the Board or Aungst's supervisors at the University.

80.    For example, in April 2023, GSIS transferred $100,000 from the sale of Endowment assets to Averett's operating account for immediate expenditure. Per the terms of the IPS, those funds should have remained in the Endowment for reinvestment.

81.    Between mid-April and early June 2023, GSIS enabled Aungst to draw $1.6 million from the Endowment. Aungst did not seek Board approval, and GSIS never sought to verify that these withdrawals from the Endowment were properly authorized by the Board. GSIS and the Individual Defendants simply sold off these Endowment assets without appropriate approvals, in direct contravention of its independent fiduciary duties to Averett.

82.    GSIS also arranged for the sale of various Endowment assets, including securities, to provide additional cash to Aungst without Board knowledge or approval.  For example, on or about May 1, 2023, GSIS complied with Aungst's request to come up with $700,000 in cash by drawing down from the margin loan, selling Treasury Money Market Funds, and from "various equity and fixed income security sales." *See, Exhibit 9.*

83.    GSIS' sale of securities without Board approval was in violation of the IPS, state and federal securities laws, and various other legal duties incumbent upon GSIS and the Individual Defendants.

84.    Between July 2023 and March 2024, when the illicit Endowment spending came to light, GSIS transferred approximately $10,413,000 out of Averett's Endowment to be used as operating funds by Aungst. Rather than notify the Board that Averett was unable to meet its operating obligations so that the Board could explore alternative financing options and cost-cutting measures, Aungst and GSIS continued – without authority and explicitly contrary to the terms of the IPS – to spend down Averett's Endowment.

***GSIS Concealed Its Endowment Spending from the Board***

85.     While enabling Aungst to spend down the Endowment without proper Board approvals, GSIS and the Individual Defendants actively hid Aungst's unauthorized Endowment spending from the Board. Between April and December 2023, GSIS personnel participated in several meetings with Averett's Board. Instead of sounding the alarm during these meetings, GSIS, through the Individual Defendants, presented misleading reports to give the Board false confidence that the Endowment remained largely intact.

86.     GSIS employees who attended meetings of the Endowment/Investment Subcommittee in which misleading reports regarding the state of the Endowment were given included Individual Defendants Curt Thompson, Matt Underwood, and Nick Boticelli.

87.     Averett's Endowment Subcommittee met on May 10, 2023, to review the Endowment's performance during the first quarter of that year. At the time of that meeting, the margin loan was maxed out to the tune of roughly $6.5 million. Further, Aungst and GSIS had pulled a total of $600,000 from the Endowment for immediate expenditure. This reduced the net value of the Endowment to roughly $13.5 million. However, the performance report that GSIS provided to the Endowment Subcommittee suggested a 4.2% increase in the endowment's value to $21,549,942. The report made no mention of the margin loan or the fact that over $7.0 million of Endowment assets had been "borrowed" to fund University operations. Instead, the relevant portion of GSIS' presentation to the Endowment Subcommittee looked like this:

## Cash Flows & Performance - AU
As of 3/31/2023



| Cash Flows | QTD | FYTD | 1 Year | 2 Year | ITD |
|---|---|---|---|---|---|
| Beginning Market Value | $20,673,651 | $21,811,562 | $25,308,135 | $19,147,715 | $0 |
| Contributions/Distributions | $8,935 | -$1,619,706 | -$2,876,506 | $2,329,898 | $21,321,792 |
| Net Invested Funds | $20,682,586 | $20,191,856 | $22,431,629 | $21,477,614 | $21,321,792 |
| Income and Appreciation | $867,357 | $1,358,087 | -$881,687 | $72,329 | $228,150 |
| Ending Value (3/31/2023) | $21,549,942 | $21,549,942 | $21,549,942 | $21,549,942 | $21,549,942 |
| Total Return | 4.2 % | 6.7 % | -2.5 % | 0.8 % | 1.2 % |

88.     The May 10, 2023 report was presented to the Subcommittee by Curt Thompson and Nick Botticelli.

89.     The Endowment Subcommittee met again on August 9, 2023, to review results from the second quarter. As of the end of the second quarter, the margin loan balance was $7.2 million, and GSIS had facilitated another $2,038,000 in unauthorized withdrawals from the Endowment (on top of the Board-authorized annual Endowment draw of $1,352,000). Factoring in the margin balance and direct expenditures from the Endowment corpus, the net value of the Endowment at the end of the second quarter of 2023 was approximately $10.3 million. However, as the screenshot below demonstrates, GSIS' report to the Endowment Subcommittee presented a much different picture, suggesting that the "Ending Value" of the Endowment value for the second quarter was $19,834,556:

## Cash Flows & Performance - AU
### As of 6/30/2023



| Cash Flows | QTD | YTD | FYTD | 2 Year | ITD |
|---|---|---|---|---|---|
| Beginning Market Value | $21,361,061 | $20,609,330 | $21,798,103 | $26,492,748 | $0 |
| Contributions/Distributions | -$2,170,000 | -$2,169,995 | -$3,849,499 | -$6,304,514 | $19,078,540 |
| Net Invested Funds | $19,191,061 | $18,439,334 | $17,948,604 | $20,188,234 | $19,078,540 |
| Income and Appreciation | $643,495 | $1,395,222 | $1,885,952 | -$353,678 | $756,016 |
| Ending Value (6/30/2023) | $19,834,556 | $19,834,556 | $19,834,556 | $19,834,556 | $19,834,556 |
| Total Return | 3.2 % | 7.0 % | 9.6 % | 0.0 % | 2.2 % |

90.     The August 9, 2023 report was presented to the Subcommittee by Curt Thompson and Nick Botticelli. Matt Underwood was also present for the meeting.

91.     The Endowment Subcommittee's third quarter meeting was November 17, 2023. The margin loan balance at the end of the third quarter was roughly $5.9 million, and the unauthorized withdrawals from the Endowment corpus totaled $4,088,000. Based on statements from Schwab, the net value of the Endowment was roughly $8.7 million. However, GSIS' report at the third quarter Endowment Subcommittee meeting proclaimed an "Ending Value" of $18,315,967.

## Cash Flows & Performance - AU
### As of 9/30/2023



| Cash Flows | QTD | YTD | 2022 | 2 Year | ITD |
|---|---|---|---|---|---|
| Beginning Market Value | $19,836,865 | $20,609,330 | $26,261,154 | $25,226,908 | $0 |
| Contributions/Distributions | -$1,183,965 | -$3,353,961 | -$2,926,577 | -$6,280,532 | $17,904,303 |
| Net Invested Funds | $18,652,900 | $17,255,369 | $23,334,577 | $18,946,376 | $17,904,303 |
| Income and Appreciation | -$336,932 | $1,060,598 | -$2,725,248 | -$630,409 | $411,665 |
| Ending Value (9/30/2023) | $18,315,967 | $18,315,967 | $20,609,330 | $18,315,967 | $18,315,967 |
| Total Return (Net of Fees) | -1.9 % | 5.0 % | -9.9 % | -0.8 % | 1.2 % |

92.     The November 17, 2023 report was presented to the Subcommittee by Curt Thompson and Nick Botticelli. Matt Underwood was also present for the meeting.

93.     At the November 17, 2023 meeting, Aungst and GSIS addressed the status of the margin loan and confirmed to the Endowment Subcommittee that no further borrowing from the margin loan would be needed through the end of the calendar year 2023.

94.     Yet, days later on or about November 28, 2023, GSIS proceeded to comply with Aungst's request for an additional $170,000 from the margin loan.

95.     GSIS further complied with Aungst's requests to withdraw roughly $2,100,000 from the Endowment in December 2023.

96.     GSIS and the Individual Defendants were aware that the Board had been informed that no such withdrawals would be needed, and yet, GSIS complied with Aungst's requests without advising the Board.

97.     GSIS did not provide anyone on the Board with a statement of the overall borrowing and spending from the Averett Endowment until – at the earliest – GSIS sent an email to the chairman of the Endowment Subcommittee, Mike Keck, on November 17, 2023, following the third quarter meeting. This email identified $6,680,000 as money "borrowed from endowment," in addition to an outstanding margin loan balance of $5,082,000.

98.     Mike Keck has no record of receiving the November 17, 2023 email.

99.     Thus, by the time GSIS finally attempted to provide accurate information regarding the spending from the endowment (in an informal follow-up email and not as part of its presentation to the Endowment Subcommittee), it had already overseen the erosion of $11,762,000 from the Endowment corpus. By the end of December, that total had grown to almost $14,000,000. All those withdrawals occurred in the span of just 13 months, from December 2022 through December 2023.

100.    Throughout this period, Aungst continuously led the Board to believe that Averett's financial condition was better than it actually was.  Aungst did not inform the Board that he was illicitly using the Endowment to cover a significant operating deficit.

101.    On or about March 19, 2024, in an e-mail responding to yet another request for funds (this time for $1.2 Million), GSIS informed Aungst that that the Endowment was almost completely depleted. GSIS informed Aungst of the margin loan position as a percentage of the endowment, the impact additional borrowing activity would cause, the current balance of the endowment, the current balance of the margin loan and the net position of the endowment factoring in the outstanding loan balance.

102.    Despite having all the requisite information, and with a fiduciary obligation to the Board to grow the Endowment and provide accurate reporting, GSIS failed to provide this type of concise and transparent information in any of the above-referenced quarterly meetings throughout 2023.

103.    Rather than reporting transparently on the illicit Endowment spending, GSIS concealed the erosion of the Endowment and enabled Aungst to continue tapping the Endowment to cover operational expenses. In effect, GSIS helped Aungst dig a financial hole that will take years for Averett to overcome. GSIS also helped Aungst cover that hole with glossy and misleading reports of positive Endowment performance.

104.    Averett learned of illicit use of the margin loan and borrowing from the Endowment in March of 2024. When the President of Averett confronted Aungst about the state of the Endowment on March 29, 2024, Aungst promptly tendered his resignation as Averett's CFO.  *See, Exhibit 10.*

### *Averett Has Suffered Irreparable Harm*

105.    The failures and breaches of both Aungst and GSIS have depleted the University's Endowment. When GSIS opened the margin loan, the Endowment was valued in excess of $20,000,000. As of April 24, 2024, by GSIS's own admission, the net balance of liquid assets in the Endowment was $1,922,657, with reference to another $2,320,000 in illiquid assets.  *See, Exhibit 11.*

106.    In the 18 months between December 2022 and April 2024, the Averett Endowment lost roughly 75% of its value due to unauthorized spending and withdrawals, all under GSIS' watch as Outsourced Chief Investment Officer and co-fiduciary.

107.    The effects of this precipitous decline are compounded by the lost investment returns – present and future – that would have been realized had the Endowment remained intact during that time period. The failures of Aungst, GSIS and the Individual Defendants to live up to their respective contractual, common law and fiduciary obligations will have financial ramifications for years into the future.

### COUNT I
### <u>Breach of Fiduciary Duty</u>
### (Against Aungst)

108.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

109.    As Averett's CFO, Aungst owed fiduciary duties of loyalty and care to Averett.

110.    Aungst breached these fiduciary duties by colluding with GSIS to ensure that the Board engaged GSIS as Averett's OCIO through a non-competitive RFP process; by arranging for Averett to participate in a margin loan program that exposed the Endowment to inordinate risk; by failing to properly explain those risks to the Board; by exposing restricted assets in the Endowment

to risk despite representing to the Board that only quasi-endowment assets would be used to collateralize the margin loan; by knowingly borrowing under the margin loan and directly from the endowment without Board approval or consent; and by concealing the extent of the unauthorized borrowing from the Endowment to the Board.

111.    As a direct and proximate result of Aungst's breaches of fiduciary duty, Averett has been injured and is entitled to damages in an amount to be proven at trial. Averett's damages include the unauthorized withdrawals from the Endowment of nearly $20 million, and the lost investment returns that would have been realized had the Endowment remained intact.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants in an amount to be deemed at trial, including costs and pre-judgement interest, punitive damages and grant such other and further relief that the Court may deem appropriate.

## COUNT II
## Breach of Fiduciary Duty
### (Against GSIS and the Individual Defendants)

112.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

113.    In its pitch to become Averett's Outsourced Chief Investment Officer, GSIS stated that it and its employees would provide "Fiduciary Oversight of [Averett's] endowment portfolio on a full-time proactivity basis."

114.    That promise was embedded in the IPS, which described Defendant's role of "Outsourced Chief Investment Officer ('OCIO') as co-fiduciary" who would "help the Board achieve its 'prudent man' fiduciary responsibility." The parties agreed that Defendant "shall . . . act as the investment advisor and co-fiduciary to the University."

115.    The parties agreed that GSIS, by and through the Individual Defendants, would serve in a fiduciary capacity to preserve Averett's Endowment and help Averett decide how best to meet its obligations to protect and grow the Endowment.

116.    Each of the Defendants undertook a fiduciary duty to Averett to preserve and grow the Endowment, to protect Averett's financial health, to act in Averett's best interest, and to report honestly and accurately upon the condition of the Endowment to Averett's Board of Trustees.

117.    GSIS and the Individual Defendants materially breached their fiduciary duties to Averett when they failed to properly manage and preserve Averett's Endowment; failed to properly report to the Board Aungst's requests to it to withdraw millions from the Endowment, in direct contravention of the Board's objectives; knowingly concealed disbursements from the Endowment and other actions from Plaintiff; misrepresented the nature and risks of the margin loan; falsely told the Board that it had to sign a corporate resolution form prior to obtaining the margin loan and materially misrepresented the origin and nature of the form; and failed to disclose the state of the Endowment it had pledged to manage until irreparable harm had been done to Plaintiff.

118.    As a direct and proximate result of Defendants' breaches, Averett has been injured and is entitled to damages in an amount to be proven at trial. Averett's damages include the unauthorized withdrawals from the Endowment of nearly $20 million, and the lost investment returns that would have been realized had the Endowment remained intact.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants in an amount to be deemed at trial, including costs and pre-judgement interest, punitive damages and grant such other and further relief that the Court may deem appropriate.

## COUNT III
### Professional Negligence
### (Against GSIS and the Individual Defendants)

119. Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

120. When GSIS and its employees agreed to serve as Averett's OCIO, Defendants assumed a duty of care to perform their financial advising services in a good and workmanlike manner in accord with industry standards.

121. Defendants undertook duties to represent Averett's interests competently, completely, and without any conflict of interest.

122. Defendants assumed a standard of care to manage the Endowment in accordance with the objectives and goals of the Board, and to provide accurate and timely reporting to the Board regarding the status of the Endowment.

123. As set forth in the IPS, Defendants also undertook a duty to act in accordance with the Uniform Management of Institutional Funds Act, which sets out guidelines for managers of Endowments to follow when managing investment portfolios.

124. Between December 2020 and April 2024, Defendants recklessly, carelessly, negligently, and unlawfully breached their duty of care to Averett. Defendants negligently breached their duty of care when they, among other things, failed to report to the Board Aungst's requests to withdraw millions from the endowment, in direct contravention of the Board's objectives; knowingly concealed disbursements from the Endowment and other actions from Plaintiff; misrepresented the nature and risks of the margin loan; falsely told Plaintiff they had to sign a corporate "Resolutions" form prior to obtaining the margin loan and materially misrepresented the

origin and nature of the form; and failed to disclose the state of the Endowment it had pledged to manage until irreparable harm had been done to Plaintiff.

125.    Defendants' negligent conduct and breach of their duties of care resulted in irreparable harm to Plaintiff. As a result of the Defendants' professional negligence, Averett's Endowment was almost entirely depleted. If Defendants had properly explained the risks of the margin loan, informed the Board of the true status of the Endowment, informed the Board of Aungst's repeated withdrawals from the Endowment, and otherwise acted with the duty of care of a financial advisor, Plaintiff would have been able to intervene to preserve the Endowment.

126.    As a direct and proximate result of the Defendants' breaches, Averett has been injured and is entitled to damages in an amount to be proven at trial. Averett's damages include the unauthorized withdrawals from the Endowment of nearly $20 million, and the lost investment returns that would have been realized had the Endowment remained intact.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants in an amount to be deemed at trial, including costs and pre-judgement interest, and grant such other and further relief that the Court may deem appropriate.

## COUNT IV
### Aiding and Abetting Aungst's Breach of Fiduciary Duty
### (Against GSIS and the Individual Defendants)

127.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

128.    Defendants knew that Don Aungst, as CFO/COO of Averett, had a fiduciary duty to the University to, among other things, supervise GSIS, review all financial information provided by GSIS, prepare and submit accurate and timely financial reports to the Board, and manage the Endowment's assets consistent with the terms of the IPA. Defendants further knew that Aungst

had a fiduciary obligation to the Board to inform them before drawing on the margin loan and before making withdrawals from the Endowment corpus beyond the spending rate permitted by the IPS.

129.   Defendants knew that Aungst materially breached his fiduciary obligations to Averett. Defendants knew that Aungst failed to provide accurate information to the Board regarding the state of the Endowment and his unauthorized withdrawals from it.

130.   And yet Defendants did not merely stand silent while Aungst drained Averett's Endowment, they aided and abetted Aungst's breach by, among other things: opening the margin loan; increasing the spending limit permitted by Schwab on the margin loan; misrepresenting the nature of the margin loan and downplaying its risks by repeatedly referring to it as a "line of credit;" drawing down the margin loan without the knowledge and consent of the Sustainable Foundation Committee of the Board contrary to Aungst's promise to the Board; failing to limit the collateral for the margin loan to Averett's "quasi-endowment" or board-restricted funds; withdrawing for Aungst nearly the entire Endowment; withdrawing more funds after it knew Aungst told the Board that no more borrowing would be needed in November 2023; and misrepresenting the state of the Endowment in numerous Board meetings.

131.   Defendants aided and abetted Aungst in breaching his fiduciary duties to Plaintiff from the inception of their relationship. Defendants knew that Aungst provided them with Averett's confidential and proprietary financial information, and they used that information to subvert what would have been a fair, objective, and impartial process to obtain their position as Averett's OCIO and supplant their predecessor firm.

132.    Defendants and Aungst acted in concert to breach their fiduciary duties to Averett. Aungst would not have been able to drain the Endowment without Defendant's knowledge, consent, and participation.

133.    Defendants benefitted from Aungst's breach. By aiding and abetting Aungst's breach, Defendants secured and maintained their position as Averett's trusted outside financial advisors, and they were compensated for their services accordingly.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant in an amount to be deemed at trial, including costs and pre-judgement interest, and grant such other and further relief that the Court may deem appropriate.

## COUNT V
## Breach of Contract
### (Against GSIS)

134.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

135.    GSIS entered into a valid and enforceable contract with Averett University, as encompassed in the Investment Advisory Contract and Investment Policy Statement.

136.    Under the Contract and IPS, GSIS contracted with Averett to "supervise and direct the investments of and for the [Endowment] Account, subject to the" IPS.

137.    Pursuant to the IPS, GSIS was contractually obligated to manage the endowment in accordance with the Uniform Prudent Management of Institutional Funds Act. Under UPMIFA, GSIS had an obligation to exercise reasonable care to comply with the duties it assumed under the IPS.

138.    GSIS had a duty to manage the Endowment fund pursuant to the spending and

investment policies contained within the IPS and Contract, and could not deviate from those policies, including the target allocation, without approval of a subcommittee of the Board of Trustees.

139.    GSIS materially breached its contractual duties to Averett. Specifically, GSIS drained Averett's Endowment, exceeding the spending rate specified in the IPS without prior approval or notification to the University; failed to supervise and direct the investments of the Endowment in accordance with the Board's investment objectives, that is, to control risk and seek a return on its investments; failed to provide accurate reports to Averett's Board of Trustees regarding the assets held and asset values; and failed to competently oversee the Endowment.

140.    As a direct and proximate result of Defendant's breaches, Averett has been injured and is entitled to damages in an amount to be proven at trial. Averett's damages include the unauthorized withdrawals from the Endowment, the lost investment returns that would have been realized had the Endowment remained intact, and the fees that GSIS received under the contract with Averett.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants in an amount to be deemed at trial, including costs and pre-judgement interest, and grant such other and further relief that the Court may deem appropriate.

**COUNT VI**
**Statutory Business Conspiracy, Va. Code §§ 18.2-499, 500**
**(Against All Defendants)**

141.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

142.    As set forth above, GSIS and the Individual Defendants associated, agreed,

mutually undertook and concerted together with Aungst to spend the University's Endowment in direct contravention of the IPS, draining the Endowment through unauthorized expenditures.

143.    GSIS, the Individual Defendants and Aungst did so knowing that their actions were unlawful and took various steps to effectuate and conceal those actions as described above, which included making false presentations to the Board that concealed the true value of the Endowment, misrepresenting the nature of the margin loan and downplaying its risks by repeatedly referring to it as a "line of credit;" drawing down the margin loan without the knowledge and consent of the Sustainable Foundation Committee of the Board contrary to Aungst's promise to the Board, and withdrawing more funds after it knew Aungst told the Board that no more withdrawals would be needed in November 2023.

144.    Through these actions, GSIS, the Individual Defendants and Aungst knowingly injured the University by depleting its Endowment. Defendants actions were undertaken willfully, wantonly, intentionally, purposefully, improperly, without legal justification, and with a conscious disregard to Plaintiff's rights.

145.    But for GSIS and the Individual Defendants' affirmative actions in combining, assisting, and acting in concert with Aungst in withdrawing millions of dollars from the Endowment fund, Plaintiff would not have lost nearly $20 million.

146.    As a result of the statutory conspiracy among Defendants and Aungst, the University has been injured in its business, reputation, trade, and profession, and is entitled to damages, including the lost investment returns that would have been realized had the Endowment remained intact, unjust enrichment, and disgorgement of unlawful profits from the scheme.

147.    Pursuant to Virginia's business conspiracy statutes, Averett is entitled to recover treble damages and its attorneys fees.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant in an amount to be determined at trial, treble damages, attorneys' fees, costs and pre-judgement interest and grant such other and further relief that the Court may deem appropriate.

## COUNT VII
### Violation of Section 10(b) and Rule 10b-5 of the Exchange Act
**(Against GSIS and the Individual Defendants)**

148.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

149.    GSIS and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal the nature of the margin loan, Averett's eligibility for the margin loan, the risks of the margin loan to Averett and the Endowment, and the withdrawals made on the loan.

150.    Beginning at least as of April 2022, Defendants violated §10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 by making false statements of material facts or omitting to state material facts needed to make the statements not misleading.

151.    GSIS and the Individual Defendants made multiple misrepresentations of material fact to Averett regarding the margin loan. Defendants' material misrepresentations included: referring to the margin loan with Schwab as a "line of credit", which materially misrepresented the nature and risks of the loan; stating that signing and executing a corporate "Resolutions" form was required by the lender to open the account, when Defendants had the account opened without it; stating that the corporate "Resolutions" form was a form belonging to Schwab when it in fact was created by GSIS; and materially misrepresenting the amount of funds that had been borrowed

when representing the assets of the Endowment when reporting to the Board. Defendants repeatedly omitted from its presentations to the Board of Trustees the true amount of money that was borrowed for the margin loan, which materially misrepresented the Endowment's value.

152.    GSIS and the Individual Defendants knew that the statements regarding the margin loan described above were materially false and misleading; knew that the statements were distributed to the Board of Trustees; and knowingly and substantially participated in, or acquiesced in, the issuance or dissemination of these statements as primary violations of securities laws.

153.    GSIS and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true value of the Endowment and maintaining GSIS's position as Plaintiff's OCIO. If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

154.    Due to its lack of knowledge of the false nature of the statements made by GSIS, the Individual Defendants and Aungst, Averett University obtained a margin loan and borrowed several million dollars with its Endowment as collateral.

155.    If the Averett Board had been made aware of the true nature of the margin loan and the restrictions on Averett's eligibility for that loan, it would not have applied for the loan, would not have completed the corporate "Resolutions" form, would not have pledged more than 25% of its Endowment as collateral, and would not have seen its Endowment eroded by millions of dollars.

156.    Based on the wrongful conduct alleged herein, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, attorneys' fees and expenses, including expert fees, as provided by law; pre- and post-pre-judgement interest at the maximum rate allowed by law; and such other and further relief that the Court may deem appropriate.

**COUNT VIII**
**Fraud**
**(Against All Defendants)**

157.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

158.    The entire relationship between Averett and GSIS was founded upon subterfuge by Aungst, GSIS and the Individual Defendants.

159.    GSIS, through the Individual Defendants, and Aungst colluded to ensure that the Board engaged GSIS as Averett's OCIO instead of conducting an appropriate process to select from potential financial managers in the marketplace.

160.    Without the knowledge or consent of the Board, Aungst provided confidential information to GSIS and allowed GSIS to circumvent a competitive process for being engaged as Averett's OCIO.

161.    As detailed above, Defendants knowingly and intentionally made false statements to the Board that the Endowment remained largely intact. Specifically, between April and December 2023, Defendants presented reports to the Board of Trustees that falsely inflated the true value of the Endowment.

162.    Likewise, GSIS and the Individual Defendants knowingly and intentionally concealed information by omitting material information regarding the Endowment. In particular, Defendants did not report to the Board the millions of dollars of withdrawals from the Endowment facilitated by Defendants.

163.    Given that GSIS was hired to be its OCIO, and was working with its CFO/COO, Averett University justifiably relied on Defendants' statements throughout the relevant time period regarding the state of the Endowment.

164.    Defendants concealed the true value of the Endowment and Aungst's excessive spending of Endowment funds.

165.    Averett was damaged by the erosion of its Endowment to roughly 75% of its value. Had Averett and its Board been given true and accurate information, it would have been able to intervene and prevent the unauthorized expenditures from the Endowment. Averett is further harmed by the lost investment returns—present and future—that would have been realized had the Endowment remained intact.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including; pre- and post-pre-judgement interest at the maximum rate allowed by law, punitive damages, and such other and further relief that the Court may deem appropriate.

**COUNT IX**
**Constructive Fraud**
**(Against All Defendants)**

166.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

167.    In the alternative, GSIS and the Individual Defendants negligently failed to tell the Board of Trustees a material fact, that is, that Averett had borrowed several million dollars against the margin loan account, such that the true value of the Endowment was several million dollars less than what the presentations to the Board of Trustees suggested.

168.    Defendants assumed a duty of care to manage the Endowment in accordance with the objectives and goals of the Board, and to provide accurate and timely reporting to the Board regarding the status of the Endowment.

169.    Given that GSIS was hired to be its OCIO, and was working with its CFO/COO, Averett University justifiably relied on Defendants' statements regarding the state of the Endowment.

170.    Defendants' presentations to the Board failed to disclose the material fact of the true value of the Endowment.

171.    As a result of the fraud, Averett was damaged by the erosion of its Endowment to roughly 75% of its value. Had Averett and its Board been given true and accurate information, it would have been able to intervene and prevent the unauthorized expenditures from the Endowment. Averett is further harmed by the lost investment returns—present and future—that would have been realized had the Endowment remained intact.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including; pre- and post-pre-judgement interest at the maximum rate allowed by law; and such other and further relief that the Court may deem appropriate.

## COUNT X
## Violation of the Virginia Securities Act Va. Code § 13.1-522(B) & (C)
### (Against GSIS and the Individual Defendants)

172.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

173.    GSIS and the Individual Defendants, individually and in concert, received, directly and indirectly, consideration from Averett for advice as to the value of securities and their purchase or sale, through the issuance of reports, analyses, and otherwise.

174.    Defendants directed provided securities advice to Averett in Virginia, and Defendants' conduct therefore occurred within and/or was directed into the Commonwealth of Virginia.

175.    Defendants are therefore subject to, and required to comply with, the requirements of the Virginia Securities Act.

176.    GSIS and the Individual Defendants employed a device, scheme, and artifice to defraud Averett University and engaged in an act, practice, and course of business which operated and would operate as a fraud or deceit on Averett University.

177.    As detailed above, Defendants knowingly and intentionally concealed information by omitting material information regarding the Endowment. In particular, Defendants did not report to the Board the millions of dollars of withdrawals from the Endowment facilitated by Defendants.

178.    GSIS and the Individual Defendants similarly made multiple misrepresentations of material fact to Averett regarding the margin loan. Defendants' material misrepresentations included: referring to the margin loan with Schwab as a "line of credit", which materially misrepresented the nature and risks of the loan; stating that signing and executing a corporate

"Resolutions" form was required by the lender to open the account, when Defendants had the account opened without it; stating that the corporate "Resolutions" form was a form belonging to Schwab when it in fact was created by GSIS; and materially misrepresenting the amount of funds that had been borrowed when representing the assets of the Endowment when reporting to the Board. Defendants repeatedly omitted from its presentations to the Board of Trustees the true amount of money that was borrowed for the margin loan, which materially misrepresented the Endowment's value.

179.    Defendants made the false and materially misleading statements specified above and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

180.    Due to the false nature of the statements made by GSIS and the Individual Defendants, Averett University obtained a margin loan. GSIS' false statement also concealed from the Board that millions of dollars in Averett's Endowment had been withdrawn.

181.    But for Defendants' misrepresentations and omissions, Plaintiffs would not have applied for the margin loan, would not have completed the corporate "Resolutions" form, would not have pledged more than 25% of its Endowment as collateral, and would not have seen its Endowment eroded by millions of dollars.

182.    As directors, officers, and/or "persons" who directly or indirectly control GSIS, the Individual Defendants are liable jointly and severally with and to the same extent as GSIS under Section 13.1-522(C) of the Virginia Code.

183.    By reason of their positions of control and authority as officers and/or directors of GSIS, the Individual Defendants had the power and authority to cause GSIS to engage in the

conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the decision-making of GSIS, including the statements made to Plaintiff.

184.    The Individual Defendants, in their capacities as officers and/or directors of GSIS, participated in and materially aided the device, scheme, and artifice to defraud set forth above. The Individual Defendants had direct supervisory involvement in the sale of the Endowment securities, and had the ability to influence and direct and did influence and direct the activities of GSIS in its violations of Section 13.1-522 of the Virginia Code.

185.    As set forth above, the Individual Defendants violated Section 13.1-522 of the Virginia Code. By virtue of their positions as controlling persons, officers and directors, and as a result of their aforesaid conduct and culpable participation, the Individual Defendants are liable pursuant to Section 13.1-522 of the Virginia Code, jointly and severally with, and to the same extent as GSIS is liable to Plaintiffs.

186.    Based on the wrongful conduct alleged herein, Plaintiff has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including the consideration received from Plaintiff for its advice and any and all loss due to such advice, attorneys' fees and expenses including expert fees, pursuant to Virginia Code §13.1-522; pre- and post-pre-judgement interest at the maximum rate allowed by law; and such other and further relief that the Court may deem appropriate.

## REQUEST FOR RELIEF

188.    Plaintiff respectfully requests that this Court enter judgment on behalf of Plaintiff and against Defendant, and order relief against the Defendants as follows:

a.  That Defendants be ordered to pay, jointly and severally, compensatory damages in an amount to be proven at trial;

b.  That Defendants be ordered to pay punitive damages;

c.  That Defendants be ordered to pay treble damages under Virginia Code §18.2-499, 500; and

d.  That Plaintiff be awarded pre-judgment and post-judgment interest on its recoverable damages;

e.  That this Court award Plaintiff its costs and expenses incurred in this action, including attorneys' fees, and such other relief as the Court deems just and proper.

### JURY DEMAND

189.  Plaintiff demands trial by jury on all issues so triable.

Dated:  March 26, 2025

AVERETT UNIVERSITY OF
DANVILLE, VIRGINIA

By:  /s/ *Harold E. Johnson, Esq.*
         *Of Counsel*
Harold E. Johnson (VSB No. 65591)
Virginia M. Burner (VSB No. 81913
WILLIAMS MULLEN
200 South 10th Street, Suite 1600
Richmond, VA 23219
Telephone: (804) 420-6000
Fax: (804) 420-6507
hjohnson@williamsmullen.com
vbruner@williamsmullen.com
         *Counsel for Averett University*
         *of Danville, Virginia*