IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
(Danville Division)

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUN 23 2025

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

AVERETT UNIVERSITY OF DANVILLE,
VIRGINIA,

        Plaintiff,

v.

GLOBAL STRATEGIC INVESTMENT
SOLUTIONS, LLC;
CURT THOMPSON;
DON CALLAGHAN;
NICK BOTTICELLI;
MATT UNDERWOOD;
DAN CHESIN;  and
DONALD BRUCE AUNGST,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 4:25CV00019

## REPLY IN SUPPORT OF THE GSIS DEFENDANTS'
## MOTION TO COMPEL ARBITRATION

C. Quinn Adams (VSB No. 90506)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
T: (804) 403-7125
F: (804) 237-0250
cadams@ohaganmeyer.com

and

Jamie B. Palfai
*Pro Hac Vice Application to be filed*
O'HAGAN MEYER
One East Wacker Drive, Ste. 3400
Chicago, Illinois 60601
T: (312) 422-6100
F: (312) 422-6110
JPalfai@ohaganmeyer.com
*Counsel for the GSIS Defendants*

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

ARGUMENT......................................................................................................................2

   I.  **Averett offers no basis for this Court to invalidate the parties' agreement
      to arbitrate**........................................................................................................2

      A.  Averett fails to establish that the arbitration provision is unconscionable........2

      B.  The effective vindication exception does not apply here.....................................4

   II.  **Averett fails to demonstrate that arbitration would be cost-prohibitive, or
      more expensive than civil litigation**........................................................................7

      A.  Averett's cost estimates are admittedly speculative.............................................8

      B.  Averett fails to establish its inability to pay the costs or arbitration....................9

      C.  Averett fails to compare the costs of arbitration and litigation.  There is
          every reason to believe that litigation will cost more than arbitration..............10

      D.  Averett's concerns about "parallel proceedings" are irrelevant and
          unfounded........................................................................................................12

   III.  **The Parties "clearly and unmistakably" delegated arbitrability to the
       arbitrator**.......................................................................................................14

   IV.  **Given the parties' delegation, the Court should ignore Averett's
       arbitrability arguments.  Even if the Court considers them,
       those arguments fail**........................................................................................16

   V.  **The Individual GSIS Defendants can invoke the arbitration provision in
      the IAC**...........................................................................................................19

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

Page

## CASES

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*
　　675 F.3d 355, 373 (4th Cir. 2012) ...............................................................14

*American Express Co. v. Italian Colors Restaurant*
570 U.S. 228, 235 (2013)................................................................................5,6,7

*American Recovery Corp. v. Computerized Thermal Imaging*
　　96 F.3d 88, 90 (4th Cir. 1996).................................................................17

*BG Grp. plc v. Republic of Arg.*
　　572 U.S. 25, 34 (2014)................................................................................16

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*
　　130 F.4th 396, 402–03 (4th Cir. 2025)....................................................15

*Blueprint Capital Advisors, LLC v. N.J. Div. of Inv.*
　　2023 U.S. App. LEXIS 34032, at *7 (3d Cir. Dec. 22, 2023)....................15

*Bradford v. Rockwell Semiconductor Sys.*
　　238 F.3d 549, 556 (4th Cir. 2001).............................................................9

*Brenco Enters. v. Bitesquad.com, LLC*
　　297 F. Supp. 3d 608, 611 (E.D. Va. 2018) ......................................15,17,18

*Brennan v. Opus Bank*
　　796 F.3d 1125, 1130 (9th Cir. 2015) ........................................................15

*Brown v. ABF Freight Sys., Inc.*
　　183 F.3d 319, 321–22 (4th 1999)..............................................................17

*Camacho v. Holiday Homes, Inc.*
　　167 F. Supp. 2d 892 (2001) .......................................................................6

*Canaan Homes LLC v. Cummings*
　　2023 Va. App. LEXIS 579, 2023 WL 5533551, at *3
　　(Va. Ct. App. Aug. 29, 2023).................................................................15,16

*Chaplain v. Chaplain*
　　2023 U.S. Dist. LEXIS 50864, at *21 (E.D. Va. Mar. 24, 2023)...............2,3

*Coinbase, Inc. v. Suski*
　　602 U.S. 143, 148 (2024)............................................................................10

*Dionisio v. Davison Design & Dev., Inc.*
  2015 U.S. Dist. LEXIS 22049, at *8 n.1 (W.D. Pa. Feb. 24, 2015)............................13

*DIRECTV, Inc. v. Imburgia*
  577 U.S. 47, 67 n.3 (2015)...................................................................................5,6,7

*Doctor's Assocs., Inc. v. Casarotto*
  517 U.S. 681, 687 (1996)...........................................................................................2

*Envirotech Corp. v. Halco Eng'g, Inc.*
  364 S.E.2d 215, 220 (Va. 1988).................................................................................3

*Gilmer v. Interstate/Johnson Lane Corp.*
  500 U.S. 20, 29 (1991)...............................................................................................7

*Green Tree Fin. Corp.-Alabama v. Randolph*
  531 U.S. 79, 82 (2000)...............................................................................................4

*Henry Schein, Inc. v. Archer & White Sales, Inc.*
  586 U.S. 63, 69 (2019)..........................................................................................14,15

*Hilti, Inc. v. Oldach*
  392 F.2d 368, 369 n.2 (1st Cir. 1968) .....................................................................13

*Isernia v. Danville Reg'l Med. Ctr., LLC*
  2024 U.S. Dist. LEXIS 202196, at *26 (W.D. Va. Nov. 6, 2024)...............................14

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*
  863 F.2d 315, 319 (4th Cir. 1988) ...........................................................................18

*Johnson v. Circuit City Stores, Inc.*
  148 F.3d 373, 377 (4th Cir. 1998) .............................................................................2

*Johnson v. Opportunity Fin., Ltd. Liab. Co.*
  318 A.3d 392, 379 (Pa. Super. 2024)......................................................................2,3

*JPay, Inc. v. Kobel*
  904 F.3d 923, 936 (11th Cir. 2018) ..........................................................................15

*Kaczmarek v. Equifax Info. Servs.*
  2025 U.S. Dist. LEXIS 114882, at *5........................................................................2

*Koridze v. Fannie Mae Corp.*
  593 F. Supp. 2d 863, 870 (E.D. Va. 2009) ................................................................9

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*
  508 U.S. 384, 398 (1993)............................................................................................6

*Lamps Plus, Inc. v. Varela*
    587 U.S. 176, 191–95 (2019) ...........................................................6,7

*Lee v. Fairfax County School Board*
    621 Fed. Appx. 761, 763 (4th Cir. 2005) .....................................3

*Meridian Imaging Sols., Inc. v. Omni Bus. Sols. LLC*
    250 F. Supp. 3d 13, 23 (E.D. Va. 2017) .......................................20

*Mey v. DIRECTV, LLC*
    971 F.3d 284, 292 (4th Cir. 2020) ...............................................18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*
    473 U.S. 614, 637 n.19 (1985).................................................7,18

*Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*
    460 U.S. 1, 24 (1983)......................................................................5

*Muriithi v. Shuttle Exp., Inc.*
    712 F.3d 173, 181 (4th Cir. 2013)........................................7,10,17

*Newman v. Plains All Am. Pipeline, L.P.*
    44 F.4th 251, 253 n. 4 (5th Cir. 2022) .......................................15

*Oil Spill by the "Amoco Cadiz" etc.*
    659 F.2d 789, 796 (7th Cir. 1981).................................................13

*PacifiCare Health Sys. v. Book*
    538 U.S. 401, 406 (2003)...............................................................17

*Peabody Holding Co., LLC v. United Mine Workers of Am., Intern. Union*
    665 F.3d 96, 105 (4th Cir. 2012) ..................................................18

*Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*
    993 F.3d 253, 257 (4th Cir. 2021) ..................................................6

*Rudolph v. Alamo Rent A Car, Inc.*
    952 F. Supp. 311, 318–19 (E.D. Va. 1997) .................................17

*Sanders v. Certified Car Ctr., Inc.*
    93 Va. Cir. 404, 407, 2016 Va. Cir. LEXIS 100, at *8 ................3

*Shenzhen Xingchen Xuanyuan Indus. Co. Ltd. v. Amazon.com Services LLC*
    735 F. Supp. 3d 453, 463 (S.D.N.Y. 2024).................................15

*Simply Wireless, Inc. v. T-Mobile US, Inc.*
    877 F.3d 522, 527 (4th Cir. 2017) ...............................................15

*Summer Rain v. Donning Co./Publishers, Inc.*
    964 F.2d 1455, 1459 (4th Cir. 1992) ............................................................................18

*Toth v. Everly Well, Inc.*
    118 F.4th 403, 414 (1st Cir. 2024) ...............................................................................15

*Trilogy Fed., LLC v. Gen. Dynamics Info. Tech., Inc.*
    2025 U.S. Dist. LEXIS 19761, at *11 (D.D.C. Feb. 4, 2025).......................................15

*Vega v. Amurcon Realty Co.*
    2025 U.S. Dist. LEXIS 60675, at *49 (W.D. Va. Mar. 31, 2025)...............................2,3

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*
    489 U.S. 468, 475–76 (1989)........................................................................................17

*White v. Sunoco, Inc.*
    870 F.3d 257, 264 (3d Cir. 2017) ................................................................................13

Defendants Global Strategic Investment Solutions, LLC ("GSIS"), Curt Thompson, Don Callaghan, Nick Botticelli, Matt Underwood, and Dan Chesin (collectively the "GSIS Defendants"), by counsel and pursuant to the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*), serve the following as their Reply in further support of their Motion to Compel Plaintiff Averett University of Danville, Virginia ("Averett") to submit its claims against the GSIS Defendants to arbitration as required by the parties' legally enforceable arbitration agreement.

## INTRODUCTION

Averett and GSIS entered into an Investment Advisory Contract ("IAC") containing an agreement to arbitrate disputes "arising under" that agreement. ECF 1-5 at p. 4, § XIV. Averett does not dispute that its claims against the GSIS Defendants involve interstate commerce and that the subject IAC is a valid agreement containing an arbitration clause. Instead, Averett seeks to avoid the parties' agreement to arbitrate by arguing that the costs of arbitration are too high or, alternatively, that the arbitration clause does not cover all of the claims or parties in this action. Both arguments are meritless.

Averett makes no attempt to connect its costs argument to a traditional contract defense. Instead, it makes an awkward attempt to invoke the oft-rejected "effective vindication" exception to the Federal Arbitration Act. Whether this Court charitably construes Averett's arguments as asserting the unconscionability defense or the effective vindication exception, the result is the same: Averett's fails to provide a valid basis for invalidating the parties' agreement to arbitrate.

Alternatively, Averett contends that the arbitration provision only covers claims concerning contractual performance. This argument is meritless. Contrary to Averett's position, the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator by invoking the AAA Rules in their arbitration agreement. It follows that an arbitrator must decide all questions

1

concerning the scope of that agreement. But even without a delegation provision, Averett's claims are within the scope of the parties' agreement to arbitrate.

## ARGUMENT

### I.     Averett offers no basis for this Court to invalidate the parties' agreement to arbitrate.

When construing an arbitration provision, courts "apply ordinary state-law principles that govern the formation of contracts." *Kaczmarek v. Equifax Info. Servs., LLC*, Civil Action No. 3:24-cv-615-HEH, 2025 U.S. Dist. LEXIS 114882, at *5 (E.D. Va. June 16, 2025) (quoting *Johnson v. Circuit City Stores, Inc.*, 148 F.3d 373, 377 (4th Cir. 1998) (other citation omitted)). A plaintiff may seek to invalidate an arbitration agreement by relying on "[g]enerally applicable [state] contract defenses such as fraud, duress, or unconscionability[.]" *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (other citation omitted)). Averett does not mention, let alone attempt to prove, that any such defenses apply in this case. Instead, it invokes the oft-rejected exception to the FAA known as the effective vindication exception.

Because Averett makes arguments that sound in unconscionability, we will briefly explain why it fails to establish that defense. We will then address Averett's arguments concerning the effective vindication exception and explain why those arguments fail as well.

#### A.     Averett fails to establish that the arbitration provision is unconscionable.

"Under Virginia law, an unconscionable agreement is one that 'no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *Vega v. Amurcon Realty Co.*, No. 6:24-cv-00020, 2025 U.S. Dist. LEXIS 60675, at *49 (W.D. Va. Mar. 31, 2025) (quoting *Chaplain v. Chaplain*, 682 S.E.2d 108, 113 (Va. App. 2009)). An agreement must be both procedurally and substantively unconscionable before a court can invalidate it. *Id.* (noting that there are two elements of unconscionability); *Johnson v. Opportunity*

2

*Fin., Ltd. Liab. Co.*, Civil Action No. 3:22cv190, 2023 U.S. Dist. LEXIS 50864, at *21 (E.D. Va. Mar. 24, 2023) ("Virginia law requires a contract to be both substantively and procedurally unconscionable to be struck down by a court.") (citation omitted).

"Procedural unconscionability reflects inequity and bad faith in the accompanying incidents ..., such as concealments, misrepresentations, undue advantage, oppressions on the part of the one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like." *Vega*, 2025 U.S. Dist. LEXIS 60675, at *49 (quoting *Lee v. Fairfax County School Board*, 621 Fed. Appx. 761, 763 (4th Cir. 2005); *Chaplain*, 682 S.E.2d at 114) (internal quotation marks omitted). This inquiry focuses "primarily" on "a grossly unequal bargaining power at the time the contract is formed." *Id*. (quoting *Johnson*, 2023 U.S. Dist. LEXIS 50864, at *25; *Envirotech Corp. v. Halco Eng'g, Inc.*, 364 S.E.2d 215, 220 (Va. 1988)) (internal quotation marks omitted).

"Substantive unconscionability requires 'gross disparity in the value exchanged,' . . . or for the inequality to be 'so gross as to shock the conscious.'" *Id*. (quoting *Lee*, 621 Fed. Appx. at 763 (first quotation); *Johnson*, 2023 U.S. Dist. LEXIS 50864, at *22 (other citations and internal quotation marks omitted). An example would be where the terms "unfairly favor one party over the other" or "impose an undue burden on the parties." *Sanders v. Certified Car Ctr., Inc.*, 93 Va. Cir. 404, 407, 2016 Va. Cir. LEXIS 100, at *8 (Fairfax Cnty. 2016).

Averett does not argue—let alone offer any facts suggesting—that any of the hallmarks of procedural unconscionability existed when the parties executed the IAC. It also does not argue that the terms of the arbitration agreement itself are so one-sided that they fall unfairly on Averett. Nor can it. *See e.g.*, *Sanders*, 2016 Va. Cir. LEXIS 100, at *8 (refusing to find an agreement

unconscionable where the arbitration provision split costs evenly among the parties). Accordingly, Averett offers this Court no basis to deem the agreement unconscionable.

      **B.**    <u>**The effective vindication exception does not apply here.**</u>

     Averett cites the U.S. Supreme Court's decision in *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 82 (2000), for the proposition that "arbitration provisions may not be enforceable where the plaintiff lacks sufficient resources to pay the costs of arbitration." ECF 18 at p. 3. Though Averett does not explicitly invoke the doctrine, by relying on *Green Tree*, it seeks to invoke the "effective vindication" exception to the FAA. The exception does not apply.

     In *Green Tree*, the Supreme Court addressed the plaintiff's argument that the arbitration provision was unenforceable because the potential costs of arbitration prevented her from effectively vindicating her federal statutory rights. Specifically, the Court considered "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." *Id*. at 82. The Court concluded that "an arbitration agreement's silence with respect to such matters ***does not*** render the agreement unenforceable." *Id*. (emphasis added).

     Averett relies on a stray aside in the majority opinion that "the existence of a large arbitration cost ***could*** preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Id*. at 90 (emphasis added). Averett wrenches that line from its context. In that same paragraph, the Court rejected the plaintiff's "effective vindication" argument because her concerns about the costs of the potential arbitration were speculative. The Court concluded that the "'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id*. It added that invalidating an agreement to arbitrate based on such speculative costs "would undermine the 'liberal federal policy favoring arbitration

agreements.'" *Id.* at 91 (quoting *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)).

The Supreme Court again refused to impose the effective vindication exception a few years later in *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 235 (2013). There, the Court assessed whether "a contractual waiver of class arbitration is enforceable under the Federal Arbitration Act when the plaintiff's cost of individually arbitrating a federal statutory claim exceeds the potential recovery." *Id.* at 231. The plaintiffs argued that without class treatment, they would not be able to effectively vindicate their statutory antitrust rights because they would lack an "economic incentive to pursue [those] claims individually in arbitration." *Id.* at 235.

Writing for the majority, Justice Scalia described the "effective vindication" principle as a "judge-made exception to the FAA" allowing courts to "invalidate agreements that prevent the 'effective vindication of a federal statutory right." *Id.* He noted that the exception arose from *dicta* in a prior case and that the Court had never used the principle to invalidate an arbitration agreement. *Id.* (citations omitted). The majority then repeated this trend by refusing to apply the exception to invalidate class action arbitration waivers, even though pursuing individual arbitrations may be cost-prohibitive for the plaintiffs. *Id.* at 236. Justice Scalia explained that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id.* (emphasis in original).

The dissenting justices in *Italian Colors* recognized that the case potentially rang the death knell for the "effective vindication" exception. *Id.* at 240–53 (Kagan, J. Dissenting); *see also DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 67 n.3 (2015) (Ginsburg, J., dissenting) ("Although the Court in *Italian Colors* did not expressly reject this 'effective vindication' principle, the Court's refusal to apply the principle in that case ***suggests that the principle will no longer apply in any***

*case*.") (emphasis added); *see also Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 257 (4th Cir. 2021). Indeed, a few years later, one of those dissenting justices again decried the Court's refusal to exercise the "effective vindication" exception in cases where consumers and employees faced cost-prohibitive arbitration. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 191–95 (2019) (Ginsburg, J., dissenting).

While the Supreme Court has never expressly rejected the "effective vindication" exception, the exception lives in much the same legal limbo as other technically alive, but effectively dead legal doctrines. It is like "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried" and "stalks" the Court's FAA jurisprudence, all to no real effect. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring). The dissents in *Italian Colors, Imburgia*, and *Lamps Plus* underscore the fact that the Supreme Court refuses to apply the exception to binding arbitration provisions simply because a plaintiff complains that the costs of arbitration are too high, even cost-prohibitive.[1] Yet, that is exactly what Averett asks this Court to do.

Even to the extent that the effective vindication exception is still somehow viable today, Averett would still not qualify for its protections. That is because the doctrine applied to a plaintiff's ability to effectively vindicate *federal statutory* rights. *See e.g., Italian Colors*, 570 U.S.

---

[1] Averett cites *Camacho v. Holiday Homes, Inc.*, 167 F. Supp. 2d 892 (2001), to suggest that this Court should employ the effective vindication exception where the plaintiff makes a sufficient showing of financial hardship. That case is unavailing in multiple respects. First, *Camacho* predated the Supreme Court's later FAA jurisprudence in *Italian Colors, Imburgia*, and *Lamps Plus*. It is doubtful that *Camacho* would have come out the same way in light of the more recent jurisprudence. Second, there is simply no comparison between the financial hardships faced by the plaintiff in *Camacho* and those Averett claims in this case. The plaintiff in *Camacho* was a single mother of three children who rarely received child support and had a weekly income of $300. *Id.* at 894–95. Plaintiff is a private university with recurring tuition receipts, revenue-generating properties, an operating budget, and a seven-figure endowment. *See, e.g.*, ECF 18-1.

at 235 n.2 (addressing the exception as holding that the "potential deprivation of a claimant's right to pursue federal remedies may render that agreement unenforceable") (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985)); *id.* at 241 (Kagan, J., dissenting) (decrying the majority's decision as "prevent[ing] the effective vindication of federal statutory rights."). Given that all but one of Averett's claims arise under state law, the effective vindication doctrine would not have any valid application here.

Even with Plaintiff's sole federal claim brought under on the Securities & Exchange Act (Count VII), the result is the same. Claims under the Exchange Act are regularly "subject to compulsory arbitration." *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 29 (1991). Averett does not allege any facts suggesting that the arbitration provision will effectively prohibit it from vindicating its rights under the Exchange Act. It merely complains that the costs of arbitration will be too high. But again, "[t]he fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Italian Colors*, 570 U.S. at 236 (emphasis in original). Nothing prevents Averett from pursuing its sole federal securities claim through contractually mandated arbitration.

## II.    Averett fails to demonstrate that arbitration would be cost-prohibitive or more expensive than civil litigation.

Putting aside the legal infirmities in its effective vindication argument, Averett fails to show that arbitration would be cost-prohibitive, let alone more expensive than litigation. To do so, Averett would need to establish: (1) the actual cost of the arbitration; (2) its ability to pay for those costs; and (3) the difference in cost between arbitrating and litigating the dispute. *See e.g., Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 181 (4th Cir. 2013).[2] Averett fails to do so.

---

[2] The Fourth Circuit decided *Muriithi* before the Supreme Court's decisions in *Italian Colors*, *Imburgia*, and *Lamps Plus*, wherein cost considerations were rejected as an "effective vindication"

**A.    Averett's cost estimates are admittedly speculative.**

Averett's brief is full of caveats and concessions that the university cannot actually determine how much an arbitration proceeding would cost. ECF 18 at p. 6 (admitting that it is "difficult to pin down the precise costs of arbitration until an arbitration panel is selected"); *id.* at p. 7 (noting that the arbitrator(s) rates could "vary significantly," noting that the university does not know how many arbitrators will be empaneled, and that it is "extremely difficult to estimate how much time arbitrators would spend on the case."). The university admits that "it is impossible to estimate with precision what the ultimate costs of arbitrating this matter would be," (*id.* at p. 8) and that "one cannot precisely predict the total costs of arbitrating this dispute[.]" *Id.*; *see also* ECF 18-4 at ¶ 14 (noting that it is "difficult to ascertain the amount of time spent by arbitrators on a given task or matter" and impossible to "compare different matters to determine the anticipated costs of a given arbitration.").

One reason those costs are so difficult to estimate is that the AAA Commercial Rules give the parties substantial latitude to modify the default rules by agreement. *See* ECF 18-6 at p. 10 (R-1(a)). Averett glazes over this fact as if it is irrelevant. *See e.g.*, ECF 18 at pp. 6–7; ECF 18-4 at ¶ 12. However, this gives the parties opportunities to cut the costs of arbitration substantially.

For example, although Averett frets about the costs of potential arbitrators and the prospect of having as many as three arbitrators on the panel (ECF 18 at pp. 7–8), the parties can agree to appoint their own arbitrator(s) instead of using those provided by AAA. *Id.* at pp. 18–19 (R-13, R-14). They can also agree to designate the number of arbitrators to hear their case. *Id.* at p. 20 (R-17), p. 42 (L-2(a)). They can agree on a location of the arbitration that reduces travel and lodging

---

exception to the FAA. It is thus plausible that the *Muriithi* test under which a plaintiff *could* use prohibitive arbitration costs as a basis to avoid arbitration is no longer viable.

costs. *Id*. at p. 17 (R-12). Finally, while the default rule is that the parties bear the costs of arbitration equally, this too can be modified by the parties' agreement. *Id*. at p. 33 (R-56).   These opportunities for cost savings undercut Averett's speculative claims about the potential costs of arbitration.

### B.    Averett fails to establish its inability to pay the costs of arbitration.

Averett complains about its annual budget deficits, its anxiety over accounts payable, and its technical default on certain construction bonds.  ECF 18-1 at ¶¶ 7–9. But, Averett admits that it has implemented effective cost-cutting measures aimed at increasing its revenues and balancing its operating budget. *Id*. at ¶¶ 11–12. It states that it believes that these and other measures will ultimately help the university turn the corner on its financial troubles. *Id*. at ¶ 13.

By any reasonable interpretation, Averett's argument is not that it cannot afford to pay the costs of the arbitration, but that it would prefer to use those funds elsewhere. In a telling concession, the university states that "[f]unds that could be directed to paying down Averett's accounts payable or to keep staff and faculty employed should not go toward expensive hourly rates charged by one or more arbitrators." ECF 18 at p. 5. Averett does not aver that it is *unable* to pay the costs of arbitration but, quite to the contrary, that the school would prefer to utilize those funds for other priorities. "Yet, proving a lack of disposable income, without further explanation, is not what the plaintiff has the burden to show; rather, [it] must demonstrate a lack of '*ability*' to advance the arbitration costs." *Koridze v. Fannie Mae Corp.*, 593 F. Supp. 2d 863, 870 (E.D. Va. 2009) (quoting *Bradford v. Rockwell Semiconductor Sys.*, 238 F.3d 549, 556 (4th Cir. 2001)) (emphasis added). A court cannot simply accept a party's "abstract contention that arbitration costs are 'too high.'" *Id*. (quoting *Bradford*, 238 F.3d at 556 n.5). That is all Averett offers here.

Equally specious is Averett's concern over the GSIS Defendants' ability to satisfy a judgment. Averett argues that the GSIS Defendants are underinsured and that the costs of defending against Averett's claims "will diminish the proceeds available for recovery." *Id.* at p. 5. It concludes that "[t]he costs of arbitrating this complex case, in light of Averett's financial position, renders the arbitration agreement unenforceable." *Id.* at p. 6.

Unsurprisingly, Averett cites to no authority for the proposition that an agreement to arbitrate is unenforceable if the defendant lacks sufficient funds to satisfy a final judgment. Nor can it. Courts do not invalidate other commercial contracts simply because strict enforcement of the parties' agreement may render the defendant unable to pay a judgment. Applying that rule exclusively to arbitration agreements would violate Congress's intent of putting arbitration agreements on "equal footing with other contracts." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (citation omitted). Concerns about a defendant's ability to satisfy a judgment do not provide grounds to invalidate an arbitration provision.[3]

**C.    Averett fails to compare the costs of arbitration and litigation. There is every reason to believe that litigation will cost more than arbitration.**

Averett estimates that the costs of arbitration could range anywhere from "tens of thousands" of dollars to over "one hundred thousand dollars." ECF 18 at p. 8. Even if these speculative estimates are correct, Averett must still compare them with the costs of litigation. *See Muriithi*, 712 F.3d at 181. It makes no attempt to do so, and for good reason. There is every reason to believe that litigating this case in federal court would cost *substantially* more than $100,000.

---

[3] Furthermore, concerns about the GSIS Defendants' ability to satisfy a judgment will apply whether this case proceeds in arbitration or in litigation. As discussed more in the following section, litigation is likely to cost substantially more.

Averett filed a 188-paragraph Complaint asserting ten causes of action against seven defendants. *See* ECF 1. The parties are only in the early stages of this litigation, but have already incurred costs in litigating the present Motion to Compel Arbitration. If the Court denies the Motion, the GSIS Defendants will have to file responsive pleadings. Undersigned counsel has already identified multiple grounds for a motion to dismiss. The parties will incur additional costs in litigating that motion.

If the parties proceed to discovery, those costs will expand significantly. Averett is likely to seek discovery from all seven defendants. Those defendants are likely to seek discovery from the university's officers, investment committee members, and board of trustees. One can easily anticipate *at least* fifteen depositions, including all six of the named individual defendants, as well as at least three depositions from each of the university's officers, committee members, and trustees members. There are likely several more relevant non-parties that the parties will need to depose before proceeding to motions for summary judgment.

The parties will incur substantial costs in drafting and litigating motions for summary judgment. If the dispute continues to trial, the trial is likely to last more than a week and cost tens of thousands of dollars or more. The anticipated cost and expense of litigating this claim through trial are substantial and would undoubtedly exceed the costs and expense of adjudicating this dispute through arbitration under the AAA Rules.

That is because AAA arbitration is designed to provide a more prompt and cost-effective resolution of disputes. For instance, AAA rules provide limits on dispositive motions. The arbitrator may, but need not, allow dispositive motions. *See* ECF 18-6 at p. 26 (R-34). The arbitrator may only do so if they determine "the moving party has shown the motion is likely to succeed and to dispose of or narrow the issues of the case." *Id*. Even then, the arbitrator must be

mindful of "the goal of achieving an efficient and economical resolution of the dispute." *Id*. Thus, there is likely to be substantially less motions practice in arbitration than under the Federal Rules.

The AAA Rules also provide for a more limited pre-hearing exchange of information and documents. This discovery process occurs at the arbitrator's discretion and with "a view to achieving an efficient and economical resolution of the dispute." *Id*. at p. 22 (R-23). The AAA Rules generally do not afford any mechanism for serving interrogatories, requests for admissions, or depositions. *Id*. Additionally, an arbitrator in a large, complex commercial case may only allow depositions in "exceptional cases" and "upon good cause shown." *Id*. at p. 43 (L-3(f)). Even then, the arbitrator must do so "consistent with the expedited nature of arbitration" and only if the person possesses information "relevant and material to the arbitration." *Id*. Without the typical tools of discovery and with strict limits on depositions, there is every reason to believe that the costs of discovery under the AAA Rules will be substantially lower than under the Federal Rules.

Speaking of the Federal Rules, it is also notable that the Federal Rules of Evidence do not apply in AAA proceedings. *Id*. at p. 26 (R-35(a)). Decisions on admissibility, relevance, and materiality are left to the arbitrator's discretion. *Id*. at R-35(b). This generally eliminates the need for motions *in limine* and evidentiary objections—another costly component of federal litigation.

Averett makes no attempt to compare its speculative estimate of the costs of arbitration to the costs of litigating this case in federal court. The discussion above shows why. The AAA Rules impose multiple deviations from the Federal Rules, all of which seek to expedite the proceedings and reduce the costs. There is no reason to believe that arbitration will cost more than litigating this case in federal court. There is every reason to believe the opposite is true.

**D.**    **Averett's concerns about "parallel proceedings" are irrelevant and unfounded.**

Averett fears that Donald Aungst, who is not a party to the IAC, may not consent to

arbitration, thereby forcing Averett to litigate its claims against Aungst while arbitrating its claims

against the GSIS Defendants. Averett concludes that the "added costs of such parallel proceedings,

along with the risks of inconsistent results, weighs against compelling arbitration." ECF 18 at p.

8.

Averett provides no authority for the proposition that a plaintiff can vitiate its valid

agreement to arbitrate its claims against Defendant A by including claims against Defendant B,

who is not a party to that agreement to arbitrate. On the contrary, courts recognize that this kind

of gamesmanship would render arbitration provisions a nullity and defeat the purposes of the FAA.

*See e.g.*, *White v. Sunoco, Inc.*, 870 F.3d 257, 264 (3d Cir. 2017) ("[P]laintiffs should not be able

to 'avoid the arbitration for which [they] had contracted simply by adding a nonsignatory

defendant.'") (citation omitted); *In re Oil Spill by the "Amoco Cadiz" etc.*, 659 F.2d 789, 796 (7th

Cir. 1981) ("It would advance neither judicial economy nor the purposes of the federal arbitration

act to permit" a party to "defeat the effect of an arbitration agreement by joining a non-

signatory as a party-plaintiff in its complaint."); *Hilti, Inc. v. Oldach*, 392 F.2d 368, 369 n.2 (1st

Cir. 1968) ("If arbitration defenses could be foreclosed simply by adding as a defendant a person

not a party to an arbitration agreement, the utility of such agreements would be seriously

compromised."); *Dionisio v. Davison Design & Dev., Inc.*, No. 14cv1631, 2015 U.S. Dist. LEXIS

22049, at *8 n.1 (W.D. Pa. Feb. 24, 2015) ("As a general matter, to permit a party to avoid

arbitration by adding a non-signatory simply to defeat the arbitration provisions of

an agreement would frustrate public policy."). The fact that Averett chose to add claims against

Aungst does not vitiate its agreement to arbitrate claims against the GSIS Defendants. Aungst's

presence is entirely irrelevant to the enforceability of the arbitration provision in the IAC.

13

In any event, Averett's fears are unfounded. The doctrine of equitable estoppel binds a non-signatory defendant "when a signatory raises claims of 'substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.'" *Isernia v. Danville Reg'l Med. Ctr., LLC*, Civil Action No. 4:22-cv-00022, 2024 U.S. Dist. LEXIS 202196, at \*26 (W.D. Va. Nov. 6, 2024) (quoting *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 373 (4th Cir. 2012)). That is the case here.

Averett contends that the GSIS Defendants and Aungst "mutually undertook and concerted together . . . to spend the University's Endowment in direct contravention of the PS, draining the Endowment through unauthorized expenditures." ECF 1 at ¶ 142. Averett further alleges that Aungst and the GSIS Defendants worked together to secure GSIS's role as the university's outsourced chief investment officer. *Id*. at ¶¶ 25–36. It alleges that Aungst was responsible for supervising GSIS and reviewing all of the financial information GSIS provided for the Board of Trustees. *Id*. at ¶ 48. It alleges that Aungst and the GSIS Defendants jointly participated in the financial transactions giving rise to the university's claims. *Id*. at ¶¶ 56, 63, 73, 78, 79, 82, 84, 85, 93–96, 103, 105, 107. Thus, Averett has sufficiently alleged "interdependent and concerted misconduct" between GSIS (a signatory) and Aungst (a non-signatory) in order to bind Aungst to the arbitration provision under the doctrine of equitable estoppel.

**III.    The Parties "clearly and unmistakably" delegated arbitrability to the arbitrator.**

Averett contends that because the arbitration provision in the IAC "does not explicitly delegate the jurisdictional inquiry to the arbitrator," the parties did not clearly and unmistakably delegate questions of arbitrability to the arbitrator. ECF 18 at p. 10. Averett is correct that the parties must clearly and unmistakably delegate questions of arbitrability to the arbitrator, or those questions are ones for the court to decide. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*,

586 U.S. 63, 69 (2019). But it takes a myopic view of what a clear and unmistakable delegation looks like. That view is incorrect.

Where the parties' arbitration provision invokes rules that delegate questions of arbitrability to the arbitrator—such as the AAA Commercial Rules—the parties have clearly and unmistakably expressed their intent to do the same. Federal courts are in near uniform accord on this point. *See Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 130 F.4th 396, 402–03 (4th Cir. 2025) (addressing the AAA Commercial Rules); *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527 (4th Cir. 2017) (discussing the parties invocation of the JAMS rules and citing cases addressing parties' invocation of the AAA rules); *Toth v. Everly Well, Inc.*, 118 F.4th 403, 414 (1st Cir. 2024) (holding the same concerning the AAA rules); *Blueprint Capital Advisors, LLC v. N.J. Div. of Inv.*, No. 23-1116, 2023 U.S. App. LEXIS 34032, at *7 (3d Cir. Dec. 22, 2023) (same); *Newman v. Plains All Am. Pipeline, L.P.*, 44 F.4th 251, 253 n. 4 (5th Cir. 2022) (same); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (same); *JPay, Inc. v. Kobel*, 904 F.3d 923, 936 (11th Cir. 2018) (same); *Shenzhen Xingchen Xuanyuan Indus. Co. Ltd. v. Amazon.com Services LLC*, 735 F. Supp. 3d 453, 463 (S.D.N.Y. 2024) (same); *Brenco Enters. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 611 (E.D. Va. 2018) (stating that federal circuit courts have "uniformly concluded" that parties "clearly and unmistakably" delegate arbitrability to the arbitrator when they invoke the AAA Commercial Rules). Similarly, "under Virginia law, like federal law, 'broad reference to the AAA Rules in the arbitration clause . . . evidences a 'clear and unmistakable' intent by the parties to have the arbitrator determine arbitrability[.]'" *Trilogy Fed., LLC v. Gen. Dynamics Info. Tech., Inc.*, Civil Action No. 24-cv-2772 (BAH), 2025 U.S. Dist. LEXIS 19761, at *11 (D.D.C. Feb. 4, 2025) (citing *Canaan Homes LLC v. Cummings*, No. 147-22-4, 2023 Va. App.

LEXIS 579, 2023 WL 5533551, at *3 (Va. Ct. App. Aug. 29, 2023)). Averett ignores this authority and posits its own definition of "clear and unmistakable" delegation. That definition is wrong.

Averett does not dispute that the parties invoked the AAA Rules in their agreement to arbitrate. It also does not dispute that the AAA Commercial Rules give the arbitrator the right to rule on questions of arbitrability. *See* ECF 18-6 at p. 14 (R-7(a)). Accordingly, the parties clearly and unmistakably delegated those questions to the arbitrator. That should end the inquiry. Any questions about the scope of the arbitration provision are for the arbitrator to decide.

## IV.     Given the parties' delegation, the Court should ignore Averett's arbitrability arguments.  Even if the Court considers them, those arguments fail.

Averett contends that, even to the extent that the arbitration provision is enforceable, it only applies to "matters of contractual performance." ECF 18 at p. 11. It also claims that the agreement contains ambiguities which militate towards a narrow interpretation. *Id.* at pp. 12–14.[4] These arguments are misplaced in several respects.

First, questions about ambiguities in an arbitration clause, the scope of an arbitration clause, or whether claims arise under an agreement containing an arbitration clause are all questions of arbitrability.  *See, e.g., BG Grp. plc v. Republic of Arg.*, 572 U.S. 25, 34 (2014) (defining questions of arbitrability to include "whether the parties are bound by a given arbitration clause" or "whether an arbitration clause in a concededly binding contract applies to a particular

---

[4] Averett identifies two perceived ambiguities. The first concerns whether the provision applies to GSIS's employees. We address that argument in section V below. Second, Averett cites the provision stating that each party submits to a court's jurisdiction "for the purpose of such arbitration and the entering of such award." ECF 1-5 at p. 4. Averett interprets this provision to mean that the parties did not waive their rights "to have this case heard in a judicial forum." ECF 18 at p. 13. That interpretation would render the rest of the provision, requiring the parties to submit claims arising under the IAC to arbitration, superfluous. The more reasonable interpretation is that the clause means the parties will not contest a court's jurisdiction to enter a final arbitration award, hear appeals of that award, etc.

type of controversy."); *see also PacifiCare Health Sys. v. Book*, 538 U.S. 401, 406 (2003) (leaving it to an arbitrator to decide how to interpret ambiguity in an agreement to arbitrate, even if the interpretation could bear upon the enforceability of that agreement). Because the parties "clearly and unmistakably" delegated such questions to the arbitrator by invoking the AAA Rules, those are questions for the arbitrator to decide.

Averett relies on several cases that it claims stand for the proposition that where parties use "arising under" language in their agreement to arbitrate, courts must construe the provision narrowly to apply only to claims relating to the performance of the parties' contract. ECF 18 at pp. 11–12 (citing *American Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 90 (4th Cir. 1996); *Brown v. ABF Freight Sys., Inc.*, 183 F.3d 319, 321–22 (4th 1999); *Rudolph v. Alamo Rent A Car, Inc.*, 952 F. Supp. 311, 318–19 (E.D. Va. 1997)). However, those cases are "clearly inapposite and . . . of no help to" Averett because none included a delegation provision, let alone one "incorporating the AAA Commercial Rules, which explicitly require submission of arbitrability issues to the arbitrator." *Brenco Enters. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 612 (E.D. Va. 2018). In each of those cases, questions about the scope of the arbitration clauses were clearly ones for the court to decide. That is not the case here.

Second, Averett asks this Court to reverse longstanding presumptions *in favor* of arbitration. Even without a delegation clause, courts must construe any ambiguities in an arbitration provision in favor of arbitration. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). Likewise, "[a]ny uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Muriithi*, 712 F.3d at 179. A court can only construe the scope of an arbitration clause or perceived ambiguity in that clause against arbitration if it can say "positive assurance that the arbitration clause is not

susceptible of an interpretation that covers the asserted dispute." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (citation omitted). Averett makes no such showing here.

Instead, Averett argues that none of its common law or statutory claims "'arise under' the parties agreement." ECF 18 at p. 12. But this ignores that fact that, "an arbitration clause committing to arbitration any dispute 'arising under' an agreement [is] 'a standard broad arbitration clause.'" *Brenco*, 297 F. Supp. 3d at 612, n. 3 (quoting *Peabody Holding Co., LLC v. United Mine Workers of Am., Intern. Union*, 665 F.3d 96, 105 (4th Cir. 2012)). By including "disputes 'arising under' language" in an agreement to arbitrate, as the parties did here in the IAC, "demonstrates an intent of the parties to submit all disputes related to the Agreement to arbitration." *Id.* at 612.

In their opening brief, the GSIS Defendants showed that Averett repeatedly invokes the GSIS Defendants' duties under the IAC, performance under the IAC, and alleged breaches of the IAC in support of its claims against the GSIS Defendants. *See* ECF 13 at pp. 9, 12–13 (citing ECF 1, at ¶¶ 3, 38–47, 49–51, 58, 62–63, 66–68, 75–77, 83–84, 86, 90, 92 114–15, 117, 120–25, 128–31, 135–40, 142, 153, 163, 169). Averett does not refute any of this. It simply notes that the bulk of its claims arise at common law or by statute. In other words, Averett did not style them as contract claims.

But the labels Averett attaches to its claims are legally irrelevant. *See e.g.*, *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319 (4th Cir. 1988) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985)). The Court must look to "factual allegations underlying" the claims and determine the "gravamen" of those claims and the "heart of the dispute" between the parties. *Id.* (first quotation); *Summer Rain v. Donning Co./Publishers, Inc.*, 964 F.2d 1455, 1459 (4th Cir. 1992) (second and third quotations). It is clear from the face of the Complaint that all of Averett's claims, however styled, arise from the theory

that the GSIS Defendants had certain duties and obligations created by the IAC, and that the GSIS Defendants failed to perform those duties and obligations to the university's detriment.[5] As such, those claims "arise under" the IAC given the broad latitude ascribed to that phrase.

**V.    The Individual GSIS Defendants can invoke the arbitration provision in the IAC.**

In their opening brief, the GSIS Defendants explained why all of the individual GSIS Defendants can invoke the protections of the arbitration provision. Two of the individuals (Callaghan and Thompson) signed the IAC as GSIS's "Representatives" and are identified in the agreement itself as "persons at [GSIS] . . . authorized to act on behalf of [Averett] and with respect to the Account." ECF 1-5 at pp. 6, 9. The GSIS Defendants went on to explain why the other three individual GSIS Defendants (Botticelli, Chesin, and Underwood) could invoke the protections of the arbitration provision under principles of equitable estoppel. ECF 13 at pp. 10–14. The GSIS Defendant showed, by reference to the allegations in the Complaint, that "Averett's claims against those defendants expressly rely upon the terms of the IAC and allege 'substantially interdependent and concerted' conduct between the individual GSIS Defendants and GSIS (their common principal)." *Id.* at p. 12.

Averett side-steps all of this analysis in its opposition. It does not even mention the phrase equitable estoppel and instead engages in an esoteric discussion about the meaning of the phrases "Platform Provider" and "Investment Manager" as they appear in the IAC. ECF 18 at pp. 13–14. Averett concludes that because the parties did not include "GSIS Employees" among those subject to the arbitration provision, those employees are simply out of luck. That is not the law. "The sensible rule [ ] that a corporation's agents or employees may in some instances invoke the

---

[5] For example, Averett's breach of fiduciary duty claims against the GSIS Defendants derive from (or otherwise *arise out of*) the relationship of trust created by the IAC; but for the IAC, Averett's fiduciary duty claims would cease to exist.

company's arbitration clause [ ] is widely recognized." *Meridian Imaging Sols., Inc. v. Omni Bus. Sols. LLC*, 250 F. Supp. 3d 13, 23 (E.D. Va. 2017). For the reasons discussed above, this is just such an instance.

## CONCLUSION

Accordingly, this Court should grant the GSIS Defendants' Motion to Compel Arbitration and force Averett to submit its claims to arbitration consistent with the parties' agreement to arbitrate.

**DATED**:  June 23, 2025                          Respectfully submitted,

                                                            **O'HAGAN MEYER**

                                                            By:  /s/ C. Quinn Adams
                                                            C. Quinn Adams (VSB No. 90506)
                                                            O'HAGAN MEYER
                                                            411 East Franklin Street, Suite 500
                                                            Richmond, Virginia 23219
                                                            T: (804) 403-7125
                                                            F: (804) 237-0250
                                                            cadams@ohaganmeyer.com

                                                            and

                                                            Jamie B. Palfai
                                                            *Pro Hac Vice Application to be filed*
                                                            O'HAGAN MEYER
                                                            One East Wacker Drive, Ste. 3400
                                                            Chicago, Illinois 60601
                                                            T: (312) 422-6100
                                                            F: (312) 422-6110
                                                            JPalfai@ohaganmeyer.com
                                                            *Counsel for the GSIS Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2025, I served a copy of the foregoing pleading on all counsel of record via ECF and electronic mail.

_/s/ C. Quinn Adams_
*Counsel for the GSIS Defendants*