UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
(Danville Division)

_____

AVERETT UNIVERSITY OF DANVILLE, )
VIRGINIA, )
           )
Plaintiff, )
v. )     Civil Action No.: 4:25cv00019
           )
           )
DONALD BRUCE AUNGST, *et al.* )
           )
Defendant. )

_____

## DEFENDANT DONALD BRUCE AUNGST'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS FOR IMPROPER VENUE AND FAILURE TO STATE A CLAIM

        Defendant, Donald Bruce Aungst ("Aungst"), by and through counsel, hereby moves to dismiss Plaintiff Averett's claims against him, pursuant to Fed. R. Civ. Pro. 12(b)(3), the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*, and Fed. R. Civ. Pro. 12(b)(6). For the reasons discussed below, this honorable Court should grant Aungst's Motion to Dismiss, or in the alternative, compel Plaintiff to bring its claims in the proper arbitration forum.

## Table of Contents

*Table of Authorities* ..............................................................................................................3

*Factual Background* ............................................................................................................5

*Legal Standard* ...................................................................................................................6

    **Motion to Dismiss for Improper Venue, and to Compel Arbitration** ............................6

    **Motion to Dismiss for Failure to State a Claim** ...........................................................8

*ARGUMENT* .....................................................................................................................10

**I.**    **Motion to Dismiss for Improper Venue, and to Compel Arbitration** ...............10

    **a.**   **Aungst Satisfies the Elements of the FAA.** ......................................................11

       1.   Averett's Complaint Provides Proof of Three of the Four Elements of the FAA: A Dispute Exists Between the Parties That Relates to Interstate Commerce, and Averett Has Failed to Arbitrate That Dispute. .................................................................................. 11

       2.   Averett's Claims Against Aungst Fall Within the Scope of the Arbitration Provision.  12

    **b.**   **Aungst Is Entitled to Invoke the Arbitration Provision** .................................14

       1.   Aungst Acts Were as An Agent of Averett. ................................................ 14

       2.   Averett is Equitably Estopped from Refusing to Arbitrate its Claims. ......................... 15

**II.**   **Motion to Dismiss for Failure to State a Claim** .................................................17

    **a.**   **Count I: Breach of Fiduciary Duty** ..................................................................17

       1.   *Aungst's Decisions Were Made Consistent with the Business Judgment Rule.* ............. 18

       2.   *Averett's Complaint is Devoid of Any Allegations of Self-Dealing or Conflict of Interest.* 20

       3.   *Aungst Acted Within His Delegated Authority Under the IAC.* ..................................... 20

    **b.**   **Count VI: Statutory Business Conspiracy** ......................................................22

       *1.*   *Averett Does Not Allege Any Agreement Between Aungst and the Defendants.* ............ 22

       2.   *Averett Makes No Allegation of Legal Malice in Aungst's Actions.* ............................. 25

       3.   *Averett's Claim of Harm Was Nothing More Than Aungst Paying the Bills.* ............... 26

    **c.**   **Count VIII: Fraud** .............................................................................................26

    **d.**   **Count IX: Constructive Fraud** .........................................................................28

*CONCLUSION* ...................................................................................................................29

# Table of Authorities

## Supreme Court

Ashcroft v. Iqbal, 556 U.S. 662 (2009). ........................................................................8
Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49 (2013)...............7
Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). ............................................................8
Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002). ...........................................8
Papasan v. Allain, 478 U.S. 265 (1986). ....................................................................9, 23
Volt Info. Scis., Inc. v. Bd. Of Trs. Of Leland Stanford Univ., 489 U.S. 468 (1989)................14

## Court of Appeals

Adkins v. Lab. Ready, Inc., 303 F.3d 496 (4th Cir. 2002) .................................................7
Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355 (4th Cir. 2012). ................................7
Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623 (4th Cir. 2006). ...........................15, 16
Amos v. Amazon Logistics, Inc., 74 F.4th 591 (4th Cir. 2023). .........................................7
Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd., 130 F.4th 396 (4th Cir. 2025) ............................13
Brantley v. Republic Mortgage Ins. Co., 424 F.3d 392 (4th Cir.2005)..............................16
Int'l Paper Co. v. Schwabedissen Maschinen & anlagen GMBH, 206 F.3d 411 (4th Cir. 2000). .............16
J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315 (4th Cir. 1988)................15
Muriithi v. Shuttle Exp., Inc., 712 F.3d 173 (4th Cir. 2013) .............................................14
Simon v. Pfizer, Inc. 398 F.3d 765 (6th Cir. 2005). .......................................................13
Wachovia Bank, Nat. Ass'n v. Schmidt, 445 F.3d 762 (4th Cir.2006) ..............................16
Weidman v. Exxon Mobil Corp., 776 F.3d 214 (4th Cir. 2015). .........................................9

## District Courts

Bhattacharya v. Murray, 515 F. Supp. 3d 436 (W.D. Va. 2021). ......................................22
Branin v. TMC Enters., LLC, 832 F. Supp. 2d 646 (W.D. Va. 2011)..................................28
Brenco Enters. v. Bitesquad.com LLC, 735 F. Supp. 3d 608 (E.D. Va. 2018)......................13
Campbell v. Anesthesia Mgmt. Sols., LLC, C/A No. 5:20-CV-3538-SAL, 2021 WL 4167530 (D.S.C.
    Sept. 14, 2021)......................................................................................................7, 8
Covington Specialty Ins. Co. v. Omega Rest. & Bar, LLC, 666 F. Supp. 3d 528  (E.D. Va. 2023)...........25
DCG & T ex rel. Battaglia/Ira v. Knight, 68 F. Supp. 3d 579 (E.D. Va. 2014) .................18, 20
Eubank v. Camping World RV Sales, LLC, 764 F.Supp.3d 321 (E.D. Va. 2025)......................13
Froelich v. Erickson, 96 F. Supp. 2d 507, 526 (D. Md. 2000) ...........................................17
Galaxy Computer Servs., Inc. v. Baker, 325 B.R. 544 (E.D. Va. 2005) .............................25
Goldstein v. Malcolm G. Fries & Assoc., Inc., 72 F. Supp. 2d 620 (E.D. Va. 1999). ...............27
Government Emps. Ins. Co. v. Google, Inc., 330 F. Supp. 2d 700 (E.D. Va. 2004)..................24
Green v. Zachry Indus., Inc., 36 F. Supp. 3d 669 (W.D. Va. 2014)....................................13
Haley v. Corcoran, 659 F. Supp. 2d 714  (D. Md. 2009) .................................................27
Heller v. TriEnergy, Inc., 877 F. Supp. 2d 414 (N.D.W. Va. 2012)...............................11, 12
Hutchinson v. Absolute Recovery Towing Am. Credit Acceptance, LLC, No. 320CV00621RJCDCK,
    2021 WL 3285037 (W.D.N.C. July 27, 2021)..............................................................15
In re First Union Corp. Sec. Litig., 128 F.Supp.2d 871 (W.D.N.C.2001)............................27
Jones-Robinson v. Costco Wholesale Corp., 744 F. Supp. 3d 421 (D. Md. 2024). ..................7
Kline v. Hyundai Motor Am. Inc., 751 F. Supp. 3d 542 (D. Md. 2024). ..............................9
Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C.Cir.1994). .................................9
Meridian Imaging Solution, Inc v. OMNI Business Solutions, Inc., 250 F.Supp.3d 13 (E.D. Va. 2017). ..15
Montgomery v. Credit One Bank, NA, 848 F.Supp.2d 601 (S.D.W. Va. 2012).....................14
Plumbers & Steamfitters Union Loc. No. 10 v. Waters, 451 F. Supp. 3d 543 (E.D. Va. 2020). ...............17

Schlegel v. Bank of Am., N.A., 505 F. Supp. 2d 321, 325 (W.D. Va. 2007)........................................22, 23
Toney v. LaSalle Bank Nat. Ass'n, 896 F. Supp. 2d 455 (D.S.C. 2012)........................................27
Virginia Transformer Corp. v. P.D. George Co., 932 F.Supp 156 (W.D. Va. 1996).................................28
Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc., 243 F.Supp.2d 386 (M.D. N.C. 2003) .......28
Weill v. Dominion Res., Inc., 875 F. Supp. 331 (E.D. Va. 1994)........................................9, 23
WLR Foods, Inc. v. Tyson Foods, Inc., 155 F.R.D. 142 (W.D. Va. 1994)...........................................19
Wolford v. United Coal Co., LLC, 764 F.Supp.3d 329 (W.D. Va. 2025).......................................8

## Bankruptcy Courts

In re Oaktree Med. Ctr., P.C., 640 B.R. 649 (Bankr. D.S.C. 2022). ...........................................6

## State Courts

Kirdassi v. White, 84 Va. App. 260 (2025)...........................................25
Sidya v. World Telecom Exch. Commc'ns, LLC, 301 Va. 3 (2022) ...........................................25
U.S. ex rel. Costner v. U.S., C.A.8 (Ark.) 2003. ...........................................9

## Federal Statute

Federal Arbitration Act, 9 U.S.C. § 1, *et seq*...........................................7

## State Statute

Va. Code Ann. § 13.1-870...........................................18

## Rules

Fed. R. Civ. Pro. 12 ...........................................8
Fed. R. Civ. Pro. 9 ...........................................9

## Secondary Authority

1 *Principles of Corporate Governance: Analysis and Recommendations* § 4.01(c) (American Law
Institute 1994)...........................................19

## Unreported Cases

Isernia v. Danville Reg'l Med. Ctr., LLC, Civil Action No. 4:22-cv-00022, 2024 U.S. Dist. LEXIS
202196 (W.D. Va. Nov. 6, 2024). ...........................................7
Peele v. Twisted Crab - Chesapeake Square, L.L.C., 113 Va. Cir. 304 (2024) ...........................................24

**Factual Background**

Averett is a private university located in Danville, Virginia. ECF 1 at ¶ 7. Aungst served as Averett's Chief Financial Officer ("CFO") between March 2020 and March 29, 2024, and this dispute arises from his tenure in that role. Id. at ¶¶ 2, 9. Averett contends that Aungst's position made him a fiduciary. ¶¶ 47, 48, 109. Due to "not stellar" results from Averette's previous advisor (ECF 1-2), Averett requested Aungst's assistance in considering a replacement for Averett's Outsourced Chief Investment Officer ("OCIO"). Aungst previously served as CFO for thirty-six (36) years at Susquehanna University, Capital University, and Mercy College between 1984 and 2020. During his service at Susquehanna and Capital University, Aungst had utilized a firm whose lead advisor is now the CEO of Global Strategic Investment Solutions, LLC ("GSIS"). Due to his first-hand knowledge of their positive performance, Aungst recommended to Averett that they consider GSIS as one option for OCIO. Id. at ¶ 36. Averett agreed that GSIS appeared to be a good option and Chairman Michael Keck requested that GSIS prepare a presentation for the board. Following GSIS' presentation to the Board of Directors on November 10, 2020, the Board agreed to forgo a formal RFP process and engage GSIS as Averette's OCIO. This engagement was memorialized in the Investment Advisory Contract ("IAC") executed on January 1, 2021, Id. at ¶ 37. In their very own complaint, Averett concedes that it is a party to the IAC as it is "a valid and enforceable contract." Id. at ¶ 135. The IAC contained a mandatory arbitration provision covering "any dispute arising under" the agreement. ECF 1-5.

The complaint further alleges that Aungst made "unauthorized borrowings" and "withdrawals" from Averett's Endowment. ECF 1, 13-22. Regarding the fraud counts, the complaint repeatedly uses collective language to describe his alleged misconduct. In one instance, Averett alleges that "Defendants knowingly and intentionally made false statements to the Board

that the Endowment remained largely intact." Id. ¶ 161.The claims against Aungst invoke common law and statutory duties to Averett, but those duties are inextricably intertwined with the IAC and its implementation. As Averett's then-CFO, Aungst signed the IAC in his official capacity, along with two other Averett officials, binding the University (and GSIS) to its terms, including the arbitration provision. Averett concedes that it is a party to the IAC, a valid and enforceable contract. Id. at ¶ 135.Similarly to Defendants Curt Thompson, Don Callaghan, Nick Botticelli, Matt Underwood, and Dan Chesin (collectively the "Individual Defendants"), Aungst was not a party to the IAC in an individual capacity. Despite this status, the Complaint's allegations against Aungst fundamentally relate to actions he took as Averett CFO– actions established and governed by the IAC – including the implementation of investment strategies, margin loan arrangements, and endowment withdrawals. ECF 1, ¶¶ 110, 141-47, 157-65. Aungst's role was even more pronounced as he was one of only three signatories acting on behalf of Averett. The Federal Arbitration Act embodies a strong presumption in favor of arbitration, and the facts and circumstances of this case clearly support enforcement of the parties' agreement to resolve their disputes through arbitration.

## **Legal Standard**

### Motion to Dismiss for Improper Venue, and to Compel Arbitration

Although the Federal Rules of Civil Procedure do not expressly reference motions to dismiss or stay proceedings in favor of arbitration, the Fourth Circuit has held that an arbitration clause functions as a "specialized kind of forum-selection clause." As such, a "motion to dismiss based on a forum-selection clause should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue." In re Oaktree Med. Ctr., P.C., 640 B.R. 649, 657 (Bankr. D.S.C. 2022) (citing Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 365 n.9 (4th Cir.

2012)). A Rule 12(b)(3) analysis turns solely on whether the selected forum exclusively comports with "the requirements of federal venue laws." Id. (citing Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 55 (2013). Notably, the mere existence of a forum-selection or arbitration clause does not render venue improper. Id.

"In the Fourth Circuit, a litigant seeking to compel arbitration under the [Federal Arbitration Act] must demonstrate '(1) a dispute exists between the parties; (2) the dispute falls within the scope of a written, valid agreement that includes an arbitration provision; (3) the parties' agreement relates to interstate or foreign commerce; and (4) the opposing party has failed or refused to arbitrate the dispute at hand.'" Isernia v. Danville Reg'l Med. Ctr., LLC, Civil Action No. 4:22-cv-00022, 2024 U.S. Dist. LEXIS 202196, at *12 (W.D. Va. Nov. 6, 2024) (quoting Amos v. Amazon Logistics, Inc., 74 F.4th 591, 595 (4th Cir. 2023)).

The FAA embodies a strong federal policy favoring arbitration. Jones-Robinson v. Costco Wholesale Corp., 744 F. Supp. 3d 421, 426 (D. Md. 2024) (citing Adkins v. Lab. Ready, Inc., 303 F.3d 496 (4th Cir. 2002)). Accordingly, courts must resolve any ambiguity regarding the scope of an arbitration clause in favor of arbitration. Id. Under 9 U.S.C. § 3, where a written arbitration agreement covers the issues in dispute, it is mandatory that the court stay the litigation. Adkins v. Lab. Ready, Inc., 303 F.3d at 500 ("A district court has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview"). Furthermore, where all claims in a matter are subject to arbitration, the court has discretion to dismiss the action in its entirety rather than merely stay it. Campbell v. Anesthesia Mgmt. Sols., LLC, C/A No. 5:20-CV-3538-SAL, 2021 WL 4167530, at *2 (D.S.C. Sept. 14, 2021).

Moreover, "whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination [u]nless the parties clearly and

unmistakably provide otherwise." Id. (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S.

79, 83 (2002). Courts must consider motions to dismiss and instead compel arbitration under the

same standard as a motion for summary judgment. See, Wolford v. United Coal Co., LLC, 764

F.Supp.3d 329 (W.D. Va. 2025).

Here, the record presents no such dispute. The arbitration clause is facially valid,

encompasses every claim asserted, and squarely satisfies the Federal Arbitration Act's

requirements. Because all causes of action fall within the agreement's breadth, retention of this

case would serve no purpose but to frustrate the parties' contractual bargain and the FAA's strong

federal policy favoring arbitration. Equity demands arbitration. As a signatory, any of Aungst's

counterclaims would necessarily be arbitrated. Likewise, Averett attempts to sue for claims arising

under the IAC without abiding by its arbitration clause. Accordingly, the Court should dismiss the

complaint in its entirety and compel the parties to proceed before the agreed-upon arbitral forum,

thereby conserving judicial resources and honoring the parties' express written intent.

Motion to Dismiss for Failure to State a Claim

Should the Court deny Aungst's to dismiss based on improper venue and compel

arbitration, it should still grant the motion because Averett's complaint fails to state a claim for

which relief can be granted. To survive a Fed. R. Civ. Pro. Rule 12(b)(6) motion to dismiss, a

plaintiff must allege enough facts "to raise a right to relief above the speculative level." Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements" cannot survive a motion to dismiss. Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009). Although the Court may assume the truth of all well-pleaded

factual allegations, a court "need not accept inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint." Weill v. Dominion Res., Inc., 875 F. Supp. 331,

339 (E.D. Va. 1994) (quoting <u>Kowal v. MCI Communications Corp.</u>, 16 F.3d 1271, 1276 (D.C.Cir.1994)). Nor must the court "accept legal conclusions cast in the form of factual allegations." <u>Id</u>. (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).

Further, the Federal Rules of Civil Procedure provide a heightened pleading standard for allegations of fraud. *See* Fed. R. Civ. Pro. 9(b). The relevant rule states that a party "alleging fraud or mistake, ... must state with particularity the circumstances constituting fraud or mistake." <u>Kline v. Hyundai Motor Am. Inc.</u>, 751 F. Supp. 3d 542, 566 (D. Md. 2024). This includes a requirement to note "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." <u>Id</u>. (citing <u>Weidman v. Exxon Mobil Corp.</u>, 776 F.3d 214, 219 (4th Cir. 2015)); *see also* <u>U.S. ex rel. Costner v. U.S.</u>, C.A.8 (Ark.) 2003, *rehearing and rehearing en banc denied*, *certiorari denied* 124 S.Ct. 225, 540 U.S. 875 (Noting that the particularity requirement of rule requiring fraud to be pled with particularity demands a higher degree of notice than that required for other claims; claim must identify who, what, where, when, and how).

Importantly, the fraud counts against Mr. Aungst suffer from a fundamental and fatal flaw: they fail to satisfy Fed. R. Civ. Pro. Rule 9(b)'s heightened pleading requirements. While the complaint contains extensive factual allegations spanning thirty-eight pages, it consistently groups "Defendants" together in conclusory fashion without particularizing the specific fraudulent statements and omissions attributable to Mr. Aungst individually. The complaint alleges that "Defendants knowingly and intentionally made false statements," "Defendants presented reports" and "concealed information," ECF 1, ¶¶ 161-62, but unsurprisingly, the complaint casts a wide net, and as a result, it falls short of identifying a single false statement that Mr. Aungst personally made. Similarly, although Averett contends its timeframe is "specific" it provides an incredibly

large eight-month window. Specifically, Averett stated that "between April and December 2023, Defendants presented reports . . . that falsely inflated the true value of the Endowment. Id. ¶ 161. Thus, the Complaint fails to identify what false statements Aungst personally made, specifically when they were made beyond a vast eight-month window, to which Board members, Committee members, or other Averett agents, or under what circumstances beyond vague references to Board meetings—the very particularity Rule 9(b) demands.

Notably, the most detailed allegations of fraudulent conduct in the complaint target GSIS and its employees, not Aungst. The complaint extensively details GSIS's mischaracterizations of margin loans as "lines of credit," fabrication of corporate resolution forms, and misleading quarterly reports to the Board. By contrast, Mr. Aungst's role appears more collaborative than that of a primary fraudulent actor, yet the complaint seeks to hold him liable for fraud based on the same group pleading approach that would be insufficient against any individual defendant.

The conspiracy count fares no better, offering only conclusory allegations that defendants "associated, agreed, mutually undertook and concerted together", Id., ¶ 142, without factual support for the specific nature of any agreement between Mr. Aungst and GSIS. The constructive fraud count compounds these deficiencies by improperly pleading an alternative theory using identical factual allegations as the intentional fraud count—a legal impossibility that renders both claims internally inconsistent.

## **ARGUMENT**

I.   <u>Motion to Dismiss for Improper Venue, and to Compel Arbitration</u>

Aungst is indisputably entitled to compel arbitration of Averett's claims. First, he meets every statutory prerequisite under the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*, thereby triggering the FAA's mandatory directive that courts enforce valid arbitration agreements.

Alternatively, even were the Court to question his direct right to invoke the clause, two independent doctrines still require arbitration. Agency principles apply because Aungst acted at all pertinent times as the authorized agent of a signatory to the IAC, and agents are routinely permitted to enforce their principal's arbitration agreements. In addition, equitable estoppel bars Averett from embracing the IAC's benefits while disavowing its arbitration mandate; having sued on rights arising out of that very contract, Averett cannot now deny its corresponding obligation to arbitrate.

Finally, compelling arbitration advances core principles of judicial economy, eliminating duplicative proceedings and the risk of inconsistent rulings. For all these reasons, the Court should dismiss the complaint and direct Averett to pursue any remaining claims exclusively in the agreed-upon arbitral forum.

    a.   <u>Aungst Satisfies the Elements of the FAA.</u>

        1.   Averett's Complaint Provides Proof of Three of the Four Elements of the FAA: A Dispute Exists Between the Parties That Relates to Interstate Commerce, and Averett Has Failed to Arbitrate That Dispute.

Averett's claims against Aungst concern Aungst's actions in his capacity as CFO with regard to the services to be performed under the IAC. The claims themselves evidence a dispute between the parties. *See,* <u>Heller v. TriEnergy, Inc.</u>, 877 F. Supp. 2d 414 (N.D.W. Va. 2012) (stating that filing a lawsuit is clear evidence of a dispute between the parties). The IAC involves issues related to interstate commerce. Averett is a non-profit university with its principal place of business located in Virginia. ECF 1, at ¶ 7. GSIS is an entity with its principal place of business located in Arizona. ECF 1, at ¶ 10. Aungst is a resident of the State of Florida, and the other individual Defendants all live outside of Virginia. ECF 1, at ¶ 12-15. As the court in <u>Heller</u> recognized, "the very act of filing a lawsuit" demonstrates a party's failure to honor its obligation to arbitrate. <u>Heller</u>

v. TriEnergy, Inc., 877 F. Supp. 2d at 429. By commencing this action, Averett has plainly disregarded its contractual commitment to resolve disputes exclusively through arbitration. These facts satisfy the first, third and fourth elements of the Isernia test.

### 2. Averett's Claims Against Aungst Fall Within the Scope of the Arbitration Provision.

Aungst can also satisfy the second element. The IAC, which Averett concedes is a valid and enforceable contract, contains a clear and unambiguous agreement to arbitrate "any dispute arising under [the IAC]." See ECF 1-5, § XI. The arbitration provision specifies that any such arbitration shall be "held in accordance with the rules, regulations and procedures then in effect of the American Arbitration Association." Id. All of Averett's claims against Aungst contain, in part, assertions that his conduct failed to perform duties that were created by the IAC, including Count I, listing actions that all occurred within the context of duties established and governed by the IAC ("arranging for Averett to participate in a margin loan program that exposed the Endowment to inordinate risk; by failing to properly explain those risks to the Board; by exposing restricted assets in the Endowment"); Count VI, which is inherently tied to the relationship created by the IAC, (Defendants worked together "to spend the University's Endowment in direct contravention of the [IAC]"); Count XIII, where Aungst's alleged misrepresentations about the endowment's status and unauthorized sharing of confidential information occurred within the scope of his responsibilities under the IAC and in connection with GSIS's OCIO services (Defendants "knowingly and intentionally made false statements to the Board," "presented reports to the Board of Trustees that falsely inflated the true value of the Endowment," and "did not report to the Board the millions of dollars of withdrawals from the Endowment); and Count IX ("Defendants assumed a duty of care to manage the Endowment in accordance with the objectives and goals of the Board"). These

claims cannot be evaluated without reference to the IAC, as the agreement establishes the framework within which all of the challenged conduct occurred. The claims therefore "arise under" the IAC and fall within the scope of its arbitration provision.

The FAA establishes a strong federal policy favoring arbitration, requiring that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, and "when faced with a broad arbitration clause, such as one covering *any* dispute arising out of an agreement, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration." Green v. Zachry Indus., Inc., 36 F. Supp. 3d 669, 678 (W.D. Va. 2014) (quoting Simon v. Pfizer, Inc. 398 F.3d 765, 775 (6th Cir. 2005); *see also* Eubank v. Camping World RV Sales, LLC, 764 F.Supp.3d 321 (E.D. Va. 2025) ("The Federal Arbitration Act ("FAA") embodies a liberal federal policy favoring arbitration agreements, and it establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration" and "[o]nly an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by arbitrators").

Fourth Circuit precedent holds that parties may also delegate the preliminary issue of arbitrability to an arbitrator, rather than the courts. *See,* In re Oaktree Med. Ctr., P.C., 640 B.R. 649, 660 (Bankr. D.S.C. 2022) (stating that the Parties may agree to have an arbitrator decide whether the parties' agreement to arbitrate covers a particular controversy). When parties invoke the commercial rules of the American Arbitration Association ("AAA"), "there is clear and unmistakable evidence that the parties intended to arbitrate arbitrability." Id.; *see also* Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd., 130 F.4th 396 (4th Cir. 2025) (analyzing applicability of AAA rules absent a delegation clause); Brenco Enters. v. Bitesquad.com LLC, 735 F. Supp. 3d 608 (E.D. Va. 2018) (holding that invoking the AAA rules "clearly and unmistakably" delegates the issue of

arbitrability).

Should this Court find that the parties did not delegate the issue of arbitrability in the IAC, it should nonetheless dismiss Averett's claims for improper venue. Doing so would follow long-standing presumptions that ambiguities must be resolved in favor of arbitration. *See*, Volt Info. Scis., Inc. v. Bd. Of Trs. Of Leland Stanford Univ., 489 U.S. 468 (1989) (ambiguities in arbitration provisions must be construed in favor of arbitration); Muriithi v. Shuttle Exp., Inc., 712 F.3d 173 (4th Cir. 2013) (questions of arbitrability are resolved in favor of arbitration). Averett's claims against Aungst are inextricably intertwined with the IAC and its implementation, and at worst, is ambiguous on the issue of arbitrability. The policy espoused by the Supreme Court and Fourth Circuit strongly support compelling arbitration. This Court need only find that the arbitration provision is "susceptible of an interpretation that covers the asserted dispute," Montgomery v. Credit One Bank, NA, 848 F.Supp.2d 601 (S.D.W. Va. 2012), a standard easily met here given the broad "arising under" language and the nature of Averett's claims.

b.   Aungst Is Entitled to Invoke the Arbitration Provision

Although Averett and GSIS are the named parties to the IAC, Aungst may nonetheless invoke its arbitration provision for several well-established reasons, including his status as an agent of a signatory, the equitable estoppel doctrine, and the overarching federal policy favoring arbitration under the FAA.

1.   Aungst Acts Were as An Agent of Averett.

First, Aungst was a signatory to the agreement, albeit in his official capacity, and courts have consistently held that corporate officers who sign agreements containing arbitration provisions may invoke those provisions when sued for actions taken in their official capacities.

*See,* Meridian Imaging Solution, Inc v. OMNI Business Solutions, Inc., 250 F.Supp.3d 13, 25 (E.D. Va. 2017) (stating that "it is undisputed that traditional contract law permits non-signatories to enforce . . . contract terms," and, "it is blackletter law that because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements"). Second, all of Averett's claims against Aungst arise from actions he took in implementing and administering the IAC - the very agreement containing the arbitration provision. This is a similar set of facts as Meridian, where the court held that a nonsignatory to an arbitration provision may still compel a signatory to arbitrate when that signatory's claims are based on the conduct of a signatory's agent. Id. Further, courts of the 4th Circuit have held that When agents are acting on behalf of a principal when performing the conduct that is subject of the dispute, that agent can enforce the arbitration agreement. *See,* Hutchinson v. Absolute Recovery Towing Am. Credit Acceptance, LLC, No. 320CV00621RJCDCK, 2021 WL 3285037 (W.D.N.C. July 27, 2021) (applying J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315 (4th Cir. 1988)).

### 2.  Averett is Equitably Estopped from Refusing to Arbitrate its Claims.

Under principles of equitable estoppel, Aungst may enforce the arbitration provision because Averett's claims against him are "inextricably intertwined" with and "arise out of" the IAC itself. It is well-established, in the 4th Circuit that "a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006). "One such situation exists when the signatory is equitably estopped from arguing that a nonsignatory is not a party to the arbitration clause." Id. "Equitable estoppel precludes a party from asserting rights he

otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." Id. (quoting Int'l Paper Co. v. Schwabedissen Maschinen & anlagen GMBH, 206 F.3d 411, 417–18 (4th Cir. 2000) (internal quotation marks omitted). "In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of [another's] signature on a written contract precludes enforcement of the contract's arbitration clause when [the party] has consistently maintained that other provisions of the same contract should be enforced to benefit him." Id.

The Fourth Circuit has applied a test to apply equitable estoppel, stating:

"[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the ... agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate."

Brantley v. Republic Mortgage Ins. Co., 424 F.3d 392, 395–96 (4th Cir.2005). The "legal principle [underlying the theory of equitable estoppel] rests on a simple proposition: it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." Wachovia Bank, Nat. Ass'n v. Schmidt, 445 F.3d 762, 769 (4th Cir.2006) (internal quotation marks and alterations omitted). Additionally, equitable estoppel is warranted "when a signatory raises claims of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 373 (4th Cir. 2012)).

Here, Averett's claims against Aungst rely on the duties and obligations created under the IAC. Discussed, *supra*, all counts Averett asserts against Aungst explicitly or impliedly reference the IAC. It would be inequitable to permit Averett to enforce those duties and obligations created under the IAC without submitting itself to the arbitration provision. This holds true whether Aungst

is considered to be acting as an agent of Averett (a signatory to the IAC), or whether the claims

are against him in his individual capacity (a non-signatory to the IAC), as Averett's complaint also

brings claims against GSIS, a signatory/party to the IAC. Averett cannot simultaneously rely on

the IAC as the source of Aungst's duties (whether signatory or non-signatory) while denying him

the benefit of the IAC's arbitration provision.[1]

II.    <u>Motion to Dismiss for Failure to State a Claim</u>

a.  Count I: Breach of Fiduciary Duty

While Count I contains extensive factual allegations, the conduct alleged does not rise to

the level of a breach of fiduciary duty under established Fourth Circuit precedent and applicable

Virginia law. "Under Virginia law, the elements of a breach of fiduciary duty claim are: (1) the

defendant owes a fiduciary duty, (2) the defendant breached that fiduciary duty, and (3) the breach

of fiduciary duty resulted in damages." <u>Plumbers & Steamfitters Union Loc. No. 10 v. Waters</u>, 451

F. Supp. 3d 543, 550 (E.D. Va. 2020); *see also*, <u>Froelich v. Erickson</u>, 96 F. Supp. 2d 507, 526 (D.

Md. 2000), *aff'd sub nom.* <u>Froelich v. Senior Campus Living, LLC</u>, 5 F. App'x 287 (4th Cir. 2001)

("To establish a breach of fiduciary duty, [a Plaintiff] must show (i) existence of a fiduciary

relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the

beneficiary").

Aungst does not dispute that he owed a fiduciary duty to Averett in his capacity as Chief

Financial Officer. However, the complaint fails to allege any specific act or omission that

constitutes a clear breach of that duty. The allegations are vague, generalized, and often conclusory

– lacking the particularity required to show that Aungst acted contrary to Averett's interests,

---

[1] Where arbitrable and non-arbitrable issues are so intertwined that the resolution of the former directly impacts the resolution of the latter, a stay of the non-arbitrable issues pending completion of arbitration may be appropriate. <u>Summer Rain v. Donning Company/Publishers, Inc.</u>, 964 F.2d 1455, 1461 (4th Cir. 1992) (citing <u>Moses H. Cone</u>, 460 U.S. at 20 n.23, 103 S.Ct. 927).

engaged in self-dealing, or misused corporate information or assets. Moreover, even if the Court were to assume *arguendo* that a breach occurred, Averett fails to articulate how that breach proximately caused any cognizable harm, an essential element of the claim. Here, the complaint does not demonstrate that Aungst acted with fraudulent intent, gross negligence, or bad faith—any of which courts require to sustain a fiduciary breach claim in the corporate context. Accordingly, Count I fails as a matter of law and should be dismissed in its entirety.

1. *Aungst's Decisions Were Made Consistent with the Business Judgment Rule.*

The complaint primarily challenges Aungst's business and operational decisions as CFO, including (1) recommending GSIS as investment advisor after the prior advisor's performance was characterized as merely "reasonably steady" and "satisfactory" (ECF 1 ¶ 19) (2) seeking additional credit facilities when Averett had "maxed out its line of credit" (ECF 1 ¶ 52), and ; (3) making operational expenditures from available university funds to cover operating deficits (ECF 1 ¶ 79).

Virginia statute provides that directors should act "in accordance with his good faith business judgment in the best interests of the corporation." Va. Code Ann. § 13.1-870(A). "Under Virginia's business judgment rule, directors are entitled to rely on the advice of others as long as the directors have no reason to doubt the reliability of the advice." DCG & T ex rel. Battaglia/Ira v. Knight, 68 F. Supp. 3d 579, 588 (E.D. Va. 2014). The same statue provides that so long as a director acts within that good faith judgment, a director is not liable for that action. *See* Va. Code Ann. § 13.1-870(C).

Sound public policy points in the direction of holding officers to the same duty of care and business judgment standards as directors, as does the little case authority that exists on the applicability of the business judgment standard to officers, and the views of most commentators support this position. 1 *Principles of Corporate Governance: Analysis and Recommendations* §

4.01(c) (American Law Institute 1994). "The question is not what some person external to the transaction, and looking at it with perfect hindsight, might believe to have been an exercise of reasonably good or bad judgment based on the substance of advice given. Rather, 'good faith' under the statute presents the question whether a *process* was engaged that would produce a defensible business decision." <u>WLR Foods, Inc. v. Tyson Foods, Inc.</u>, 155 F.R.D. 142, 145–46 (W.D. Va. 1994), *aff'd*, 65 F.3d 1172 (4th Cir. 1995) (emphasis in original).

The allegations in the complaint describe business decisions made within Aungst's purview and authority as CFO, not breaches of fiduciary duty. Under applicable Virginia business judgment principles, these good faith business decisions—even if ultimately unsuccessful—do not constitute breaches of duty absent evidence of self-dealing or conflicts of interest. Here, Aungst acted within his authority as CFO to "keep the lights on" given Averett's declining enrollment and lack of fundraising in the years leading up to his arrival. Averett concedes that its previous advisor was "not stellar", and the mediocrity led to Averett's search for a new OCIO. Further, Averett concedes that it was in "perilous financial condition," including "an extensive operating deficit" and "default on $14.6 million in construction bonds." ECF 18, 3-4. Averett states that it has "had to implement a number of cost-saving measures to secure the University's financial solvency." <u>Id</u>. at 4. Those austerity measures are the same that Aungst sought to avoid when choosing to draw down the Endowment, the very same Endowment that Averett concedes was created by donors to "support the University indefinitely." ECF 1, ¶ 46. Incredulously, Averett now tries to claim that Aungst's good faith decision to use the Endowment for its intended purpose is somehow a breach of his fiduciary duty. Averett's position that the Endowment will support the University indefinitely without being accessible to cover acute, perilous solvency issues – by the very Officer whose duty it is to pay the University's expenses – defies logic.

2.  *Averett's Complaint is Devoid of Any Allegations of Self-Dealing or
    Conflict of Interest.*

The complaint fails to allege that Aungst personally benefited from any of the challenged
actions or had any conflicts of interest. The factual allegations show that Aungst sought additional
financing to address legitimate operational cash flow needs, that his relationship with GSIS was
professional, not personal or financial, and does not contain a single allegation of kickbacks,
personal enrichment, or self-dealing. *See*, DCG & T ex rel. Battaglia/Ira v. Knight, 68 F. Supp. 3d
at 588 (stating that the Rule 12 (b)(6) motion in that case must fail because the complaint had
alleged the director in the case acted in bad faith for their own enrichment or careless disregard for
the interest of the principal). At best, Averett's complaint alleges that Aungst recommended
GSIS's hire, (ECF 1 ¶ 25) and that Aungst had a "longstanding relationship" with GSIS's
managing partner (Id. ¶ 26). This fails to allege any selfish or personal reason for his
recommendation other than having personal knowledge of prior positive performance by GSIS.
The mere existence of a pre-existing relationship does not lead to a presumption of some* form of
collusion. Averett's complaint alleges that Averett didn't engage in an RFP process, but instead
"turned the matter over to GSIS." Id. at 30. In reality, Averett's own Board decided to forgo a
formal RFP process and then went on to execute the IAC, with not only Aungst, but also President
Tiffany Franks and Controller Lisa Stewart serving as binding signatories, evidencing that Aungst
did not – and could not – have acted independently to engage GSIS *at all*, much less for his own
benefit. ECF 1-5, 6.

3.  *Aungst Acted Within His Delegated Authority Under the IAC.*

The Investment Policy Statement ("ISP") delegated authority to Aungst for "routine
portfolio management activities." ECF 1-6. The complaint's allegations focus squarely on
Aungst's endowment-related activities such as supervising GSIS, reviewing GSIS's materials,

providing financial reports to the committee and board, and management of cash and short-term liquidity, all tasks that were delegated to him by the ISP and the Committee.

Aungst's actions were within his properly delegated authority as CFO, particularly given Averett's financial condition. The Board's delegation of fiduciary responsibility to the Investment Committee, and the Committee's sub-delegation to Aungst, created appropriate authority for his actions. Critically, Averett's allegations now run afoul of the ISP, which states that "the ultimate responsibility for managing The Fund, shall rest with The Board, which may delegate responsibility to the [Investment] Committee." Id. at 1. The Investment Committee consisted of "persons who are familiar with the investments currently used by institutional investors, in order to assure sophisticated understanding of investment opportunities and strategies, risk and reward factors, and measurement techniques." Id.

Aungst's actions were ratified by the Investment Committee, and by extension the Board, at every turn. In addition to acting as one of three signatories for the IAC, Averett required Aungst (as well as Franks and Stewart) to provide his initials in several areas of the IAC, identifying himself as representative of Averett. ECF 1-5, § IX, XVIII, XIX. Averett similarly ratified Aungst's actions when it approved the margin loan arrangement, despite its apparent now-claimed hesitations with the paperwork. ECF 1 ¶ 52-69. Averett concedes it was provided reports that included contribution and distribution figures on at least three occasions (ECF 1, ¶¶ 87, 89, 91). Averett has taken steps to address its "perilous financial condition," with "cost-saving measures," tacitly acknowledging that Aungst's use of the Endowment staved off such measures during his tenure. Averett's claim that Aungst breached a fiduciary duty by executing actions expressly delegated to him – and subsequently ratified by the University's Board and Investment Committee, both composed of individuals with investment experience and a sophisticated understand of

strategies employed –is legally unsound and factually disingenuous. Simply put, Averett cannot manufacture liability by retroactively second-guessing decisions that were fully authorized, transparently executed, and consistent with the University's stated objectives at the time. The claim is meritless and should be dismissed with prejudice.

     b.  Count VI: Statutory Business Conspiracy

Count VI against Mr. Aungst should be dismissed because the complaint fails to plead the essential elements of statutory business conspiracy under Virginia Code §§ 18.2-499, 500. To prevail under this statute, "a plaintiff must prove by clear and convincing evidence the following elements: (1) concerted action; (2) legal malice; and (3) causally related injury." Bhattacharya v. Murray, 515 F. Supp. 3d 436, 465 (W.D. Va. 2021), aff'd, 93 F.4th 675 (4th Cir. 2024) (citing Schlegel v. Bank of Am., N.A., 505 F. Supp. 2d 321, 325 (W.D. Va. 2007)).

Averett's pleading fails on every element. First, the complaint fails to note any form of concerted action as it lumps Aungst together in conclusory fashion, but offers no factual allegations showing any actual agreement or coordinated conduct. Bare assertions of parallel conduct are insufficient pleadings. Second, not a single fact is pled suggesting that Aungst's alleged acts were motivated by a purpose to injure and with malice. The pleading identifies no concrete, non-speculative business damages proximately caused by any purported conspiracy. Allegations of generalized financial stress or reputations harm do not suffice.

     1.  *Averett Does Not Allege Any Agreement Between Aungst and the Defendants.*

The complaint's conspiracy allegations rely on conclusory language that fails to establish the existence of an actual agreement between Mr. Aungst and the other defendants. At best, Averett alleges that "GSIS and the Individual Defendants associated, agreed, mutually undertook and

concerted together with Aungst to spend the University's Endowment." ECF 1, ¶ 142 This bare allegation of agreement is precisely the type of conclusory statement that fails to satisfy modern pleading standards. *See*, Weill v. Dominion Res., Inc., 875 F. Supp. 331, 339 (E.D. Va. 1994) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) when stating that the court need not "accept legal conclusions cast in the form of factual allegations"). "To survive a motion to dismiss, then, a plaintiff must at least plead the requisite concert of action and unity of purpose, and must do so in more than mere conclusory language." Schlegel v. Bank of Am., N.A., 505 F. Supp. 2d 321, 326 (W.D. Va. 2007) (internal citations omitted).

Other than self-serving legal conclusions, the complaint provides no factual allegations supporting the existence of a specific agreement or understanding between Mr. Aungst and GSIS to engage in the alleged conspiracy. While the complaint details Mr. Aungst's requests for withdrawals and GSIS's compliance with those requests, it fails to allege facts showing these parties agreed in advance to engage in a coordinated scheme to defraud the University. Assuming, *arguendo*, that Aungst and GSIS acted outside the scope of their duties, at best, the complaint's factual allegations are consistent with Mr. Aungst making unauthorized requests for funds and GSIS improperly complying with those requests, rather than evidencing a pre-existing agreement to conspire. The complaint alleges that Mr. Aungst "asked for GSIS' assistance" (ECF 1, ¶ 52) in obtaining credit facilities and later made specific withdrawal requests (ECF 1, ¶ 106), but these sequential interactions do not establish the meeting of minds required for conspiracy. *See*, Schlegel v. Bank of Am., N.A., 505 F. Supp. 2d at 328 (where the court found that even when multiple Defendants act improperly towards Plaintiff, that did not prove that they had done so in concert). This lack of agreement is further illustrated by the fact that Aungst received no benefit to this alleged conspiracy, as discussed above. Averett's complaint also seems to signal an argument that

Aungst acted in order to benefit GSIS but is completely devoid of specifics as to why Aungst would do so. What little argument Averett attempts to make in this regard also fails, as GSIS's fee was to be a percentage of the endowment. ECF 1-5. Continued withdrawal of the endowment would necessarily result in lower fees for GSIS. In other words, what Averett attempts to paint as collusion would instead offer no benefit to Aungst and a loss to GSIS.

"[C]laims for conspiracy must be plead with particularity." Peele v. Twisted Crab - Chesapeake Square, L.L.C., 113 Va. Cir. 304 (2024). "[B]usiness conspiracy, like fraud, must be pleaded with particularity, and with more than 'mere conclusory language.' The heightened pleading standard prevents every business dispute over unfair competition becoming a business conspiracy claim." Government Emps. Ins. Co. v. Google, Inc., 330 F. Supp. 2d 700, 706 (E.D. Va. 2004). Averett fails to adequately allege overt acts in furtherance of its conspiracy theory. Instead, it suffers from group pleading, lacking any sort of particularity. For example, the complaint alleges that defendants took "various steps to effectuate and conceal those actions" including "making false presentations to the Board" and "misrepresenting the nature of the margin loan." ECF 1, ¶ 143. However, these allegations fail to specify which overt acts were performed by Mr. Aungst individually, as distinct from GSIS's actions.

Averett's complaint makes much ado about Aungst "colluding" with GSIS to become Averett's investment advisory firm. Id. at ¶ 25. These allegations focus on Aungst sharing reports with GSIS to "facilitate GSIS' preparation of a PowerPoint presentation for Aungst to use in an upcoming meeting with Averett's Board." Id. at ¶ 31. Averett goes on to allege that Aungst did this, without the Board's awareness, to improperly give GSIS "special access" as an advantage to win the contract. Id. at ¶ 32.[2] However, a November 6, 2020, email from Aungst to the Board

---

[2] Ironically, Averett also alleges that Aungst failed to engage in an RFP process. It offers no explanation to cure the inconsistent logic that Aungst would give GSIS confidential information – information that would have been given

shows the real reason for the disclosure to GSIS, and the secrecy around it: Aungst was concerned

that Averett's former advisory firm would learn that Averett was considering new advisors.[3] ECF

1-4, 3. Far from seeking to injure Averett, Aungst's email made it clear that he supported GSIS's

presentation because it "could save the University as much as $150,000 in fees, should result in

improved performance and would present other opportunities for the University." Id. He went on

to caution the Board to "not share the GSIS material with [the prior advisory firm]." Id.

### 2.   *Averett Makes No Allegation of Legal Malice in Aungst's Actions.*

Averett's complaint regurgitates language in the statute, stating that "Defendants actions

were undertaken willfully, wantonly, intentionally, purposefully, improperly, without legal

justification, and with a conscious disregard to Plaintiff's rights." ECF 1, ¶ 144. While actual

malice is not required under the act, Galaxy Computer Servs., Inc. v. Baker, 325 B.R. 544, 555

(E.D. Va. 2005), "[t]o show that the conspirators acted with legal malice, a plaintiff must show

that at least *one* of the purposes of the conspiracy was to injure the plaintiff's reputation, trade, or

business." Covington Specialty Ins. Co. v. Omega Rest. & Bar, LLC, 666 F. Supp. 3d 528, 540

(E.D. Va. 2023) (internal citations omitted) (emphasis in original). In other words, Averett

complaint improperly expands the meaning of "intentionally" to include any act Aungst did with

intention, rather than Virginia's requirement that the act be done with the intent to injure. *See* Sidya

v. World Telecom Exch. Commc'ns, LLC, 301 Va. 3 (2022) (conspiracy requires purpose of

willful and malicious injury); Kirdassi v. White, 84 Va. App. 260 (2025) (same).

The complaint's own allegations suggest Mr. Aungst was attempting to address the

University's acknowledged financial difficulties, including that Averett had "maxed out its line of

---

to any potential OCIO in preparing its own "pitch" – to "win" an RFP process that he had allegedly already rigged in
GSIS's favor.

credit" and faced operational deficits. Contrary to Averett's claims of conspiracy, these facts are more consistent with attempting to bolster the University during a time of downturn. As discussed, *supra*, Aungst's vouching for GSIS was motivated by the potential savings and increase in investment performance. While Aungst might not have prevented Averett's need to engage in the austerity measures it decried in its recent filings, it is evident that his intentions were to help save Averett from further injury, not inflict more. What's more, Averett's complaint fails to allege how the conspiracy theory, distinct from the underlying claims, has caused any additional or distinct harm.

    3.  *Averett's Claim of Harm Was Nothing More Than Aungst Paying the Bills.*

Averett's complaint alleges that it "lost nearly $20 million" as a result of the alleged conspiracy. Rather than causing damage, Aungst's endowment withdrawals were necessary emergency measures to maintain operations during Averett's existing financial crisis. The withdrawals provided essential cash flow to meet payroll obligations and keep the institution operational during a critical period following low enrollment and fundraising activities due to the COVID-19 pandemic. Aungst's actions, while depleting endowment assets, prevented a more catastrophic outcome—the potential closure of the institution. The endowment withdrawals allowed Averett to continue operating and serving students during a critical period when alternative financing was unavailable; rather than causing these problems, Aungst's actions merely postponed the implementation of these painful but necessary measures.

    c.  Count VIII: Fraud

Count VIII fails to meet Fed. R. Civ. Pro Rule 9(b)'s demanding particularity requirements because it employs impermissible group pleading that fails to specify the fraudulent conduct

attributable to Mr. Aungst individually, as distinct from the other defendants. Under Rule 9, particularity of pleading is required "with regard to the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud— the 'who, what, where, why, and when.'" Toney v. LaSalle Bank Nat. Ass'n, 896 F. Supp. 2d 455, 480 (D.S.C. 2012), aff'd, 512 F. App'x 363 (4th Cir. 2013) (citing In re First Union Corp. Sec. Litig., 128 F.Supp.2d 871 (W.D.N.C.2001)).

"When a complaint alleges fraud against multiple defendants, Rule 9(b) requires that the plaintiff identify each defendant's participation in the alleged fraud." Haley v. Corcoran, 659 F. Supp. 2d 714, 721 (D. Md. 2009). "[I]n multiple-defendant cases, such as the one at bar, circumstances must be stated for each defendant. A plaintiff may not group all wrongdoers together in a single set of allegations." Goldstein v. Malcolm G. Fries & Assoc., Inc., 72 F. Supp. 2d 620, 627 (E.D. Va. 1999). "Plaintiffs are forbidden from grouping defendants together without specifying which defendant committed which wrong and are required instead to set forth with particularity each defendant's culpable conduct." Toney v. LaSalle Bank Nat. Ass'n, 896 F. Supp. at 480 (internal citation omitted).

The complaint's fraud allegations against Mr. Aungst suffer from a fatal group pleading deficiency. In numerous paragraphs, Averett alleges that the Defendants – which includes Aungst, GSIS, and the five individuals that make up the "Individual Defendants" – engaged in subterfuge (ECF 1,¶ 158), "knowingly and intentionally made false statements" (ECF, ¶ 161), "did not report to the Board . . . withdrawals . . . facilitated by Defendants" (ECF, ¶ 162), and "concealed the true value of the Endowment." (ECF, ¶ 164). This collective allegations faults to identify what specific statements, concealments, or non-reports are attributable to Aungst, when he engaged in such statements, concealments, or non-reports, or to whom he stated, concealed, or failed to report the

same. This lack of particularity regarding Mr. Aungst's individual fraudulent conduct, contrasted with the detailed specificity provided for GSIS's actions, demonstrates the complaint's failure to satisfy Rule 9(b) as to Mr. Aungst.

    d.   Count IX: Constructive Fraud

Count IX suffers from the same Rule 9(b) deficiencies as Count VIII but also presents an additional fatal flaw: it is improperly pleaded as an alternative to intentional fraud using identical factual allegations. Averett pleads constructive fraud "in the alternative" to the intentional fraud alleged in Count VIII. "Constructive fraud requires a showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation. Branin v. TMC Enters., LLC, 832 F. Supp. 2d 646, 653-54 (W.D. Va. 2011). In other words, the elements of actual fraud and constructive fraud are different. See, Virginia Transformer Corp. v. P.D. George Co., 932 F.Supp 156 (W.D. Va. 1996) (stating that actual fraud differs decisively from constructive fraud); Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc., 243 F.Supp.2d 386 (M.D. N.C. 2003) (stating that constructive fraud is distinct from actual fraud).

However, both Counts VIII and IX rely on substantially the same factual allegations regarding concealment of endowment withdrawals and misrepresentations about the endowment's value. This creates an internal inconsistency because the same conduct cannot be both intentional (as alleged in Count VIII) and negligent (as required for constructive fraud in Count IX). Constructive fraud requires negligent omission or misrepresentation without intent to defraud, while intentional fraud requires knowledge and intent to deceive. By using identical factual allegations for both claims, the complaint fails to establish the distinct factual basis required for each theory of fraud, namely whether the alleged conduct was done "intentionally" or

"negligently," as Averett claims.

## CONCLUSION

For the foregoing reasons, this Court should enforce the arbitration provision contained in Section XIV of the Investment Advisory Contract and grant Defendant Aungst's Motion Dismiss and Compel Arbitration. The IAC contains a valid and enforceable arbitration provision, Aungst is entitled to invoke that provision as a signatory to the agreement as Averett's agent, and all of Averett's claims against him fall squarely within the scope of the arbitration clause as they arise from actions taken pursuant to the IAC's implementation. Alternatively, Aungst as a non-signatory can compel enforcement of the arbitration provision under equitable estoppel because Averett seeks to enforce the IAC against GSIS, the other party. The strong federal policy favoring arbitration, combined with the clear language of the arbitration provision and the nature of Averett's claims, requires that this dispute be submitted to arbitration in accordance with the terms of the IAC.

Even if the Court declines to dismiss this action for improper venue, dismissal is still compelled under Rule 12(b)(6). Averett's own pleadings and exhibits admit facts that negate essential elements of every cause of action, leaving nothing more than conclusory assertions and legal labels. In short, the complaint is fatally defective on its face and should be dismissed with prejudice for failure to state a claim.

Alternatively, if any residual claim against Mr. Aungst survives, the Court must stay further litigation. Under 9 U.S.C. § 3 and consistent with Fourth Circuit precedent, once any issue in a suit is referable to arbitration, the balance of the case should be stayed pending completion of those

arbitral proceedings.  A stay will honor the parties' contractual commitment, conserve judicial resources, and eliminate the risk of inconsistent outcomes.

Dated: July 7, 2025                                  Respectfully submitted,

                                                     THE MUNDACA LAW FIRM, LLC

                                                     *By: /s/ Francisco E. Mundaca*
                                                     Francisco E. Mundaca
                                                     VSB No. :96073
                                                     THE MUNDACA LAW FIRM, LLC
                                                     1997 Annapolis Exchange Pkwy
                                                     Suite 300
                                                     Annapolis, Maryland 21401
                                                     Phone: (202) 474-8500
                                                     Fax: (240) 233-8626
                                                     Email: fmundaca@mundacalaw.com

                                                     and

                                                     *By: /s/ Zachary S. Aman*
                                                     Zachary S. Aman
                                                     *Pro Hac Vice Application to be filed*
                                                     THE MUNDACA LAW FIRM, LLC
                                                     1997 Annapolis Exchange Pkwy
                                                     Suite 300
                                                     Annapolis, Maryland 21401
                                                     Phone: (202) 474-8500
                                                     Fax: (240) 233-8626
                                                     Email: zaman@mundacalaw.com

                                                     *Counsel for Defendant*
                                                     *Donald Bruce Aungst*