CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
8/6/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| AVERETT UNIVERSITY, | ) |
| Plaintiff, | ) Case No. 4:25-cv-00019 |
| v. | ) **MEMORANDUM OPINION** |
| GLOBAL STRATEGIC INVESTMENT SOLUTIONS, LLC, *et al.*, | ) By:   Hon. Thomas T. Cullen<br>)        United States District Judge |
| Defendants. | ) |

On June 2, 2025, Defendant Global Strategic Investment Solutions, LLC ("GSIS"), and Defendants Curt Thompson, Don Callaghan, Nick Botticelli, Matt Underwood, and Dan Chesin (collectively, "the individual GSIS Defendants") filed a motion to compel arbitration against Plaintiff Averett University ("Averett" or "the university"). (ECF No. 12.) On July 7, 2025, the remaining defendant, Donald Bruce Aungst ("Aungst"), filed a motion to dismiss, or in the alternative, to compel arbitration. (ECF No. 20.) For the reasons stated below, the court will grant the defendants' motions to compel arbitration.

## I.   BACKGROUND & PROCEDURAL HISTORY

Averett is a private university located in Danville, Virginia. (Compl. ¶ 7 [ECF No. 1].) Averett is managed by a board of trustees ("the Board"), which has authority over the university's endowment and investments. (*Id.* ¶ 8.) In March 2020, Averett hired Aungst to serve as its Chief Financial Officer. (*Id.* ¶ 24.) Shortly after he was hired, Aungst began coordinating with GSIS and pushed the Board to hire GSIS as the university's new Outsourced Chief Investment Officer ("OCIO"). (*See id.* ¶¶ 25–36.) The Board agreed, and on January 1,

2021, Averett and GSIS formalized their engagement by executing an Investment Advisory Contract ("IAC").[1] (*Id.* ¶¶ 36–37.)

Under the IAC, GSIS agreed to carry out the duties of supervising Averett's investments and endowment in a manner consistent with the university's Investment Policy Statement, including its spending guidelines, and to make regular financial reports to the Board. (*See id.* ¶ 38; ECF No. 1-5 at 2, § 1.) Additionally, both Callaghan and Thompson, managing partners of GSIS, were "authorized to act on behalf of [Averett] with respect to" GSIS's duties as OCIO. (ECF No. 1-5 at 9.) The other GSIS Defendants—Botticelli, Underwood, and Chesin—also provided services to Averett under the contract in their capacity as GSIS employees. (*See* Compl. ¶¶ 14–17.)

Relevant to these motions, the IAC contained a mandatory arbitration provision stating that "[t]he parties agree that any dispute arising under this Agreement . . . shall be determined by an arbitration proceeding, which shall be held in accordance with the rules, regulations and procedures then in effect of the American Arbitration Association." (ECF No. 1-5 at 4, § XIV.)

Averett contends that between April 2022 and April 2024, "while serving as a fiduciary and investment advisor to Averett, GSIS and its employees, in collaboration with Aungst, surreptitiously drained Averett's endowment of almost $20 million." (Compl. ¶ 4.) In perpetrating this alleged misconduct, GSIS exploited a margin loan worth millions of dollars and withdrew assets from the university's endowment at the request of Aungst, all without

---

[1] Two of the individual GSIS Defendants, Don Callaghan and Curt Thompson, signed the IAC as GSIS's "Representative[s]." (*See* ECF No. 1-5 at 6.)

proper approval from the Board. (*See id.* ¶¶ 5, 73.) GSIS and Aungst allegedly "actively hid" this activity from the Board by misrepresenting their loan strategy and concealing the "type and nature of the withdrawals," and had, by March 2024, reduced the endowment by approximately 75% of its original value. (*Id.* ¶¶ 5–6, 105–106.)

On March 26, 2025, Averett filed a complaint against GSIS, its officers and employees, and Aungst, alleging numerous claims, including breach of contract, breach of fiduciary duties, fraud, and violations of securities laws. (*See generally* Compl.) On June 2, GSIS and the individual GSIS Defendants filed a motion to compel arbitration, asserting their rights under the IAC. (*See* ECF Nos. 12 & 13.) Averett filed a response opposing the motion (ECF No. 18), and the GSIS Defendants filed a reply (ECF No. 19). On July 7, the remaining defendant, Aungst, also filed a motion to dismiss and compel arbitration. (*See* ECF Nos. 20 & 21.) Averett filed its response to that motion on July 28, and Aungst replied on August 4. (ECF Nos. 26 & 27.) Therefore, the motions are ripe for decision.[2]

## II.   STANDARD OF REVIEW

### A. Motion to Compel under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C § 2. The FAA reflects that arbitration agreements are matters of contract, *see Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63,

---

[2] The court dispenses with oral arguments because they would not aid the court in deciding the discrete issue before it.

67 (2010), and that "courts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

In the Fourth Circuit, a litigant seeking to compel arbitration under the FAA must demonstrate "(1) a dispute exists between the parties; (2) the dispute falls within the scope of a written, valid agreement that includes an arbitration provision; (3) the parties' agreement relates to interstate or foreign commerce; and (4) the opposing party has failed or refused to arbitrate the dispute at hand." *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 595 (4th Cir. 2023). "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2022) (citing *United States v. Bankers Ins.*, 245 F.3d 315, 319 (4th Cir. 2001)). Accordingly, "[i]n deciding whether to compel arbitration, courts must 'engage in a limited review to ensure that the dispute is arbitrable—*i.e.*, that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the scope of that agreement.'" *Hetrick Cos. v. IINK Corp.*, 710 F. Supp. 3d 467, 481 (E.D. Va. 2024) (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)).

"The standard for deciding a motion to compel arbitration brought under the FAA . . . is similar to the standard applicable to a motion for summary judgment." *Wolford v. United Coal Co.*, 764 F. Supp. 3d 329, 334 (W.D. Va. Jan. 28, 2025) (internal citation omitted). Under Rule 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Whether a fact is material

depends on whether it "might affect the outcome of the suit" under the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). If no material facts are in dispute, the court will decide whether the parties intended to arbitrate their disputes as a matter of law. *See Chorley Enters., Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 564 (4th Cir. 2015).

### III. ANALYSIS

At the outset, the parties agree that a dispute exists, that their purported agreement relates to interstate commerce,[3] and that Averett has refused to arbitrate the dispute. Therefore, the only question is whether this dispute "falls within the scope of a written, valid agreement that includes an arbitration provision." *Amos*, 74 F.4th at 595. To answer that question, the court will address, in turn, (1) whether there is a valid, enforceable arbitration agreement between Averett and Defendants; (2) whether this dispute is within the scope of that agreement (and who must decide that question); and (3) Averett's defense against arbitration.

**1. Validity and Enforceability of the Agreement**

"[A]rbitration is a matter of contract[,] and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v.*

---

[3] GSIS is incorporated and has its principal place of business in Arizona. (Compl. ¶ 10.) Therefore, through the IAC, it offered client services to Averett, a Virginia-based university, in interstate commerce. Additionally, the individual defendants are residents of different states, including Arizona, Florida, and North Carolina. (*Id.* ¶¶ 11–16.) Finally, Averett concedes in its complaint that Defendants "used the instrumentalities of interstate commerce" in connection with their actions related to at least Count VII of the complaint. (*Id.* ¶ 23.)

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). In deciding whether to compel parties to arbitrate a dispute, the court must determine whether a valid agreement to arbitrate exists. *See Hetrick Cos.*, 710 F. Supp. 3d at 481. The validity of an arbitration agreement is determined "according to state law principles governing contract formation." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 288 (4th Cir. 2020).

First, as to GSIS, there is no doubt that the parties entered into a valid agreement. Averett admitted in its complaint that it entered into a "valid and enforceable contract" with GSIS, "as encompassed in the [IAC]." (Compl. ¶ 135.) And that contract included the arbitration provision at issue. (*See* ECF No. 1-5 at 4, § XIV.) Therefore, the parties agree that Averett and GSIS entered into a valid contract, which included an arbitration provision, and that both Averett and GSIS were signatories to the contract.

But that does not answer the question of whether the individual GSIS Defendants or Aungst, who were not signatories to the IAC, can enforce that agreement. Generally, non-signatories to an arbitration provision cannot compel arbitration unless some principle of state law or equity gives them the right to do so. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 286–87 (4th Cir. 2023). But it is "well established" under Virginia[4] law that "under certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 268 (Va. 2019) (internal quotation omitted).

---

[4] Virginia law governs because Averett (the client) is a resident of Virginia. (*See* ECF No. 1-5 at 5, § XVI.) ("The validity of this Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the laws of the state in which the client resides . . . .")

- 6 -

A non-signatory may rely on the principle of equitable estoppel to enforce an arbitration agreement. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 438 (2020). Under Virginia law, there are two circumstances in which equitable estoppel may apply: (1) reliance on the agreement; or (2) substantially interdependent and concerted conduct. *See, e.g.*, *Decisive Analytics Corp. v. Chikar*, 75 Va. Cir. 337, 2008 WL 6759965, at *6 (July 15, 2008) (citing *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 625–27 (4th Cir. 2006)). Based on both theories, the individual GSIS Defendants and Aungst can properly invoke equitable estoppel and demand the claims against them be sent to arbitration.

First, estoppel applies when a signatory "must rely on the terms of the written agreement in asserting [its] claims" against a non-signatory. *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005) (internal quotation omitted) (holding that estoppel applies where claims are "intertwined" with terms of the contract); *see also GE Energy Power Conversion France SAS, Corp.*, 590 U.S. at 438. "When each of a signatory's claims against a non[-]signatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement . . . ." *Brantley*, 424 F.3d at 396 (cleaned up). "Because this legal test examines the nature of the signatory's underlying allegations against the non[-]signatory," the court must examine the underlying claims to determine if estoppel applies. *Long*, 453 F.3d at 627.

Generally, estoppel is appropriate when "the signatory's underlying complaint is based on the non[-]signatory's alleged breach of the obligations and duties assigned to it in the agreement." *Id.* at 628 (cleaned up). Such claims can include breach of contract, breach of a fiduciary duty, or fraud. *See, e.g.*, *Chikar*, 2008 WL 6759965, at *7 (applying equitable estoppel

when the plaintiff's claims of conversion, breach of fiduciary duty, and fraud depended on the allegation that the defendant breached a duty created by a subcontract).

In this case, Averett brings many claims against GSIS and the individual GSIS Defendants, all of which clearly, and often by the complaint's own admission, relate to and rely on the IAC. For example, Count II (Breach of Fiduciary Duty—Against GSIS and the Individual Defendants) expressly alleges that GSIS and the individual GSIS Defendants "materially breached their fiduciary duties" (Compl. ¶ 117) which were created by the IAC when "[t]he parties agreed that GSIS, by and through the Individual Defendants, would serve in a fiduciary capacity . . ." (Compl. ¶ 115).[5] In Count III (Professional Negligence—Against GSIS and the Individual Defendants), Averett alleges that, when the parties executed the contract, "Defendants assumed a duty of care" to perform their services well. (*Id.* ¶ 120.) And in Count VI (Virginia Statutory Business Conspiracy), Averett alleges that GSIS and the individual GSIS Defendants "mutually undertook . . . to spend the University's Endowment in direct contravention of the" Investment Policy Statement, which Defendants were required to follow *because of* the IAC. (*Id.* ¶ 142; *see also id.* ¶ 38.) These claims certainly derive from the IAC. And even if one of the other claims against the individual GSIS Defendants does not fall neatly under the "reliance" theory, these lingering claims, and the claims against Aungst, are alternatively covered by their "substantial interdependence" with the claims and allegations of misconduct brought against GSIS—a signatory to the IAC.

---

[5] In its complaint, Averett alleges that the IAC "affirmed the duties of GSIS and the [GSIS Defendants] as Chief Investment Officer." (Compl. ¶ 38.)

Equitable estoppel also applies when a signatory raises claims of "substantially interdependent and concerted misconduct by both [a] non-signatory and one or more of the signatories to the contract." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 373 (4th Cir. 2012) (quoting *Brantley*, 424 F.3d at 396); *see also Chikar*, 2008 WL 6759965, at *6–7 (adopting the Fourth Circuit tests for estoppel). Specifically, "there must be allegations of coordinated behavior between a signatory and a non[-]signatory defendant," and "the claims against both the signatory and non[-]signatory defendants must be based on the same facts, be inherently inseparable, and fall within the scope of the arbitration clause." *Aggarao*, 675 F.3d at 374 (internal quotations omitted). This, too, is a cut and dry case.

In each of Counts II, III, IV, VI, VII, VIII, IX, and X, naming the individual GSIS Defendants, Averett also includes, as it must, GSIS. As previously established, GSIS is unquestionably a signatory to the IAC. And in every claim brought against the GSIS Defendants, Averett cannot carve out the conduct of the non-signatory defendants. Indeed, each allegation of misconduct is attributed to "GSIS *and* the Individual Defendants." (*See* Compl. ¶¶ 112–176 (emphasis added).) Moreover, Averett alleges "GSIS and the Individual Defendants" "mutually undertook" (Compl. ¶ 142) and worked "in concert" (Compl. ¶¶ 132, 149, 173) to harm Averett, and that GSIS worked "through the Individual Defendants" to engage in fraud against Averett (Compl. ¶ 159). Averett cannot separate the conduct of GSIS from that of the individual GSIS Defendants, and based on its pleadings, neither can the court.[6]

---

[6] In its complaint, Averett includes the description of "GSIS and its employees, the [individual GSIS Defendants], as 'co-fiduciaries' who manage endowment portfolios . . . ," seemingly endorsing the idea that

- 9 -

The claims against Aungst fare no better. Averett argues, with little support, that because Aungst was an employee of Averett, he cannot invoke the arbitration clause against it. (*See* Pl.'s Second Opp. at 2 [ECF No. 26].) Moreover, Averett contends, the claims against Aungst do not rely on the IAC because his duties to the university were created outside of the IAC. (*See id.* at 3.) Although reliance on the IAC presents a closer question for Aungst, reliance is not the only avenue to invoking equitable estoppel. Averett offers no argument in response to Aungst's position that his allegedly "interdependent and concerted" conduct with GSIS would also allow him to invoke equitable estoppel. The court finds Aungst's position persuasive.

In Count I (Breach of Fiduciary Duty), Averett specifically alleges that Aungst (a non-signatory) "collud[ed] with GSIS" (a signatory) to breach his fiduciary duties. (Compl. ¶ 110.) And in Count VIII (Fraud), Averett again alleges that GSIS and Aungst "colluded" to influence the Board.[7] (Compl. ¶ 159.) Similarly, in Count VI (Virginia Statutory Business Conspiracy), Averett alleges that "GSIS and the Individual Defendants associated, agreed, mutually undertook and concerted together with Aungst" to spend the university's money in contravention of the contract. (Compl. ¶ 142.) Averett, in sum, plainly alleges "substantially interdependent and concerted misconduct" between Aungst and GSIS that is based on the same facts and is "inherently inseparable." *See Aggarao*, 675 F.3d at 373–74. That is determinative on this issue.

---

GSIS and its employees are functionally inseparable and took on the same duties under the contract. (*See* Compl. ¶ 28.)

[7] Count IX alleges "constructive fraud" as an alternative to Count VIII and relies on essentially the same facts. (*See* Compl. ¶ 167.)

Accordingly, the individual GSIS Defendants and Aungst, though non-signatories to the IAC, have a right to enforce the IAC and its arbitration provision, and Averett is equitably estopped from refusing to arbitrate its claims against them.

## 2. Scope of the Agreement

The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions . . . ." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) (citing *Rent-A-Ctr., W., Inc.*, 561 U.S. at 68-70). When determining whether the parties have so agreed, the court "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (alterations omitted). Many courts have directly held that the explicit incorporation of commercial arbitration rules providing that arbitrators resolve disputes over arbitrability satisfies the clear-and-unmistakable standard. *See, e.g.*, *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 526–28 (4th Cir. 2017) (holding that an arbitration provision's incorporation of the Judicial Arbitration and Mediation Services rules in a contract between sophisticated parties clearly and unmistakably assigns disputes over arbitrability to arbitration), *abrogated on other grounds by Henry Schein*, 586 U.S. 63 (2019); *Toth v. Everly Well, Inc.*, 118 F.4th 403, 414 (1st Cir. 2024) (holding the same concerning American Arbitration Association ("AAA") rules); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (same); *see also Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 130 F.4th 396, 403 (4th Cir. 2025) (accepting without deciding the district court's conclusion that incorporation of the AAA rules delegates questions of arbitrability to the arbitrator).

Under that precedent, this case is simple. The IAC explicitly incorporates the AAA rules by providing that "[t]he parties agree that any dispute arising under this Agreement . . . shall be determined by an arbitration proceeding, which shall be held in accordance with the rules, regulations and procedures then in effect of the American Arbitration Association." (ECF No. 1-5 at 4 § XIV.) The AAA rules mandate that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." (ECF No. 13-2 at 14 § R-7(a).) That text is clear and ends this dispute. *Cf. Brenco Enters., Inc. v. Bitesquad.com, LLC*, 297 F. Supp. 3d 608, 611–12 (E.D. Va. 2018) (finding parties' agreement to arbitrate all "disputes arising under" the contract and incorporate the AAA rules meets the clear-and-unmistakable standard).

Averett argues that there is a lack of clear language explicitly delegating the jurisdictional inquiry to an arbitrator. (*See* Pl.'s Opp. Mot. to Compel at 10 [ECF No. 18]; Pl.'s Second Opp. at 5.) But Averett does not sufficiently explain why the IAC's incorporation of the AAA rules does not meet the standard, or why any of the many cases holding otherwise are incorrect or distinguishable. For one, Averett contends that Defendants' reliance on *Berkeley County School District* is misplaced because the parties in that case conceded the delegation and the Fourth Circuit did not officially rule on the issue. *See Berkley Cty. Sch. Dist.*, 130 F.4th at 401. Fair enough, as far as it goes. But while the Fourth Circuit acknowledged that, as of the *Berkeley County* decision, it has never decided the specific question of whether the incorporation of the AAA rules meets the clear-and-unmistakable standard, it also acknowledged that many other circuits *have*, and that the district court below found those

decisions persuasive. *See id.* at 403. Accordingly, with no binding Fourth Circuit precedent to follow, this court considers the numerous other courts that have decided the issue and, like the district court in *Berkeley County*, finds those cases persuasive.

Second, in its response to Aungst, Averett argues that any reliance on *Brenco* is also unwarranted. (*See* Pl.'s Second Opp. at 5.) In *Brenco*, the court found that an agreement with an arbitration clause that "includes expansive language and incorporates a specific set of rules requiring that the arbitrator determine arbitrability" meets the clear-and-unmistakable standard. *Brenco Enters.*, 297 F. Supp. 3d at 612. The agreement at issue provided that any "disputes arising under" the agreement were subject to arbitration "in accordance with" the commercial AAA rules—nearly identical language to the IAC. *Id.*; (*see also* ECF No. 1-5 at 4, § XIV). The *Brenco* court had "no doubt" given this clear language. *See Brenco Enters.*, 297 F. Supp. 3d at 612. Averett argues, puzzlingly, that *Brenco* is distinguishable because that court "already made a preliminary determination that the case was arbitrable, because at issue was the 'interpretation of the contract' between the parties." (Pl.'s Second Opp. at 5 (citing *Brenco Enters., Inc.*, 297 F. Supp. 3d at 613).) But Averett has not read *Brenco* carefully. The court explicitly stated that the first question to answer is who decides the question of arbitrability. *See Brenco Enters., Inc.*, 297 F. Supp. 3d at 611. The court then swiftly and soundly concluded that the parties delegated the question to the arbitrator.[8] *See id.* at 612. Only then did the court offer its *opinion* that, even though arbitrability must be addressed by the arbitrator, the dispute

---

[8] To the extent Averett relies on *Peabody Holding Co. v. United Mine Workers of Am., Int'l Union*, 665 F. 3d 96 (4th Cir. 2012), this court also agrees with *Brenco* that *Peabody* is "clearly inapposite" to the present case because it did not include an arbitration provision that incorporated the AAA rules. *Brenco Enters., Inc.*, 297 F. Supp. 3d at 612.

was "very likely" to be found arbitrable because the parties sought a ruling on the "interpretation of the contract." *Id.* at 612–13 ("Thus, *even if* arbitrability were for a court and not the arbitrator to decide, the claims brought by Brenco would nonetheless be subject to arbitration." (emphasis added)). The court could not have "already made a preliminary determination that the case was arbitrable" because the court itself held that the question was not one for it to decide since the parties had clearly and unmistakably delegated the question to the arbitrator.

Because Averett's arguments are unavailing and the opinions of the many other courts to decide this issue are persuasive, the court concludes that the IAC clearly and unmistakably delegates arbitrability to the arbitrator. "[W]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein*, 586 U.S. at 68. Accordingly, the court leaves the question of arbitrability and the scope of the parties' agreement to the arbitrator.

### 3. "Effective Vindication" Defense

Finally, the court must address Averett's argument that the court should nonetheless deny the Defendants' demands for arbitration. As its primary defense against compelling arbitration, Averett cites *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90–92 (2000), for the proposition that "arbitration provisions may not be enforceable where the plaintiff lacks sufficient resources to pay the costs of arbitration." (Pl.'s Opp. Mot. to Compel at 3.) Averett contends that this is such a case, but the court finds this argument wholly unpersuasive.

The so-called "effective vindication" doctrine is fundamentally concerned with prohibiting arbitration agreements that do not allow plaintiffs to effectively vindicate their federal statutory rights. *See, e.g.*, *Green Tree Fin. Corp.-Alabama*, 531 U.S. at 90; *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013). "Arbitration must permit a party to effectively vindicate statutory claims so that 'the statute will continue to serve both its remedial and deterrent function.'" *Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 340 (4th Cir. 2020) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). In *Green Tree*, the Supreme Court endorsed the principle that a prohibitively expensive arbitration proceeding *could* prevent a plaintiff from "effectively vindicating" his or her federal statutory rights.[9] *See Green Tree*, 531 U.S. at 90. In this case, Averett brings ten claims against Defendants, one of which alleges a violation of a federal statute (the Securities and Exchange Act § 10(b)),[10] and asserts that arbitration of all these claims would be prohibitively expensive given its current, dire financial situation as a result of Defendants' alleged misconduct.

Averett points to *Camacho v. Holiday Homes, Inc.*, 167 F. Supp. 2d 892, 895–97 (W.D. Va. 2001), as an example of a case where a judge of this court found it appropriate to reject an arbitration agreement because of financial hardship on the plaintiff. In *Camacho*, the court found that the plaintiff "ha[d] presented substantial evidence that the costs of arbitrating her

---

[9] This rule stems from the notion that an unconscionable contractual provision is unenforceable. *See Camacho v. Holiday Homes, Inc.*, 167 F. Supp. 2d 892, 894 (W.D. Va. 2001) (noting that Camacho argued "that the arbitration provision is unconscionable because the excessive fees associated with the arbitration of her claims prohibit her from accessing the arbitral forum"); *see also Marroquin v. Dan Ryan Builders mid-Atlantic, LLC*, No. 5:19-cv-00083, 2020 WL 1171963, at *4 (W.D. Va. Mar. 11, 2020) (discussing the unconscionability doctrine under Virginia law).

[10] While the court is skeptical that the exception applies to anything other than claims based on federal statutory rights, since Averett has brought at least one claim alleging the violation of a federal statute, the court will assume the exception could apply in this case.

claims would preclude her from vindicating her federal statutory rights" under the Truth in Lending Act. 167 F. Supp. 2d at 896. The plaintiff in *Camacho* demonstrated that she was a young, single mother of three with a significantly limited income from going to school and working as a waitress, and that she had no ability to pay for the initial administration fees let alone the full costs of arbitration. *Id.* at 894–97. Therefore, the court concluded that the "arbitral forum [was] financially inaccessible to her." *Id.* at 897. Notwithstanding the fact that *Camacho* was decided before the Supreme Court significantly narrowed the effective-vindication doctrine in practice,[11] it is obviously distinguishable. The plaintiff in *Camacho* was an individual with a severely limited income; she could not secure loans or other financial assets; and she was proceeding *in forma pauperis* in the district court with the help of the Legal Aid Society because she could not even pay the filing fee or, presumably, hire an attorney. *See id.* This is a far cry from the plaintiff in this case, a struggling, but still viable, non-profit organization with considerable assets and revenue.

In any event, Averett's assertion that arbitration would be cost prohibitive is "too speculative to justify the invalidation of an arbitration agreement." *Green Tree*, 531 U.S. at 91. As the party seeking to override the arbitration agreement, Averett "bears the burden of showing the likelihood of incurring such costs." *Id.* at 92.[12] And Averett can only offer assumptions or speculation about the many ways arbitration could play out or could implicate

---

[11] *See, e.g.*, *Italian Colors Rest.*, 570 U.S. at 240–53 (Kagan, J., dissenting); *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 67 n.3 (2015) (Ginsburg, J., dissenting) ("[T]he Court's refusal to apply the principle in [*Italian Colors*] suggests that the principle will no longer apply in any case.").

[12] The Supreme Court declined to say how detailed such a showing must be before the burden shifts to the opposing party to present contrary evidence. *See Green Tree*, 531 U.S. at 92.

higher costs.[13] Averett argues that there will be high administrative fees, high hourly or daily rates charged by potentially one or more arbitrators, and that the cost of arbitration could quickly become overwhelming depending on the length or complexity of the case. (*See* Pl.'s Opp. Mot. to Compel at 6–8.) But tied to this argument is the admission that the cost of arbitration is daunting precisely because of how *speculative* it is.[14] As Defendants correctly note, there are numerous ways that the parties could ultimately agree to cut costs—which is to the benefit of all parties.[15] Importantly, Averett does not go so far as to say that it will be wholly unable to vindicate its federal statutory rights through arbitration, but merely argues that its funds should go to a better use (e.g., paying its employees) and "should not" go toward "a costly arbitration process." (Pl.'s Opp. Mot. to Compel at 5.) While the court is sympathetic to Averett's financial predicament, its speculative fears are not enough. Without more, the court will not apply such a rare exception given the well-established, strong federal policy in favor of arbitration.

---

[13] The Supreme Court in *Green Tree* could not even justify applying the exception in that same case. *See Green Tree*, 531 U.S. at 90–92; *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013) (acknowledging but declining to apply the exception). The Court observed that the "risk" alone that a plaintiff "will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.* at 91. "To invalidate the agreement on that basis would undermine the 'liberal federal policy favoring arbitration agreements.'" *Id.* (internal citation omitted).

[14] Although the court in *Camacho* did not find fee ranges to be too speculative, that case is further distinguishable because even if Camacho were subject to the lowest rates possible, evidence established that arbitration would still be financially inaccessible for her. Not so here where, as Defendants argue, the costs of arbitration could be mitigated and there is no evidence that if the parties were to agree to cost-cutting measures that Averett would still have "no ability" to pay.

[15] Tellingly, some of Averett's financial fears have already been assuaged. In its first opposition, Averett cited the possibility that Aungst will not agree to arbitrate his claims and will force expensive parallel proceedings in both arbitral and judicial forums. (*See* Pl.'s Opp. Mot. to Compel at 8.) Because Aungst has now filed his own motion to compel arbitration, this fear is resolved. If anything, this is an illustrative example of how speculative fears may turn out to be just that—and the court should not rely on such uncertain predictions.

### 4. Disposition

That just leaves the court to determine this case's proper disposition. "[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001). Otherwise, the court must stay the lawsuit pending arbitration of "any issue referable to arbitration." *Adkins*, 303 F.3d at 500 (quoting 9 U.S.C. § 3).

A stay is appropriate here. The arbitrator(s) might decide that some of the claims brought by Averett against Defendants are not within the scope of the arbitration agreement or are otherwise not arbitrable. So the court will stay this litigation pending arbitration because the court may ultimately have to resolve some of Averett's claims. *See* 9 U.S.C. § 3; *Nardello v. Boehringer Ingelheim USA Corp.*, No. JKB-15-3792, 2016 WL 5940844, at *5–6 (D. Md. Oct. 13, 2016).

### IV. CONCLUSION

For the foregoing reasons, the court will grant Defendants' motions to compel arbitration (ECF Nos. 12 & 20). Proceedings in this matter will be stayed pending the resolution of arbitration.

The Clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 6th day of August, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE